OPINION
Defendant-appellant, Linda S. Dever, appeals a decision of the Clermont County Court of Common Pleas, Domestic Relations Division, ordering plaintiff-appellee, Michael L. Dever ("Dever"), to pay her $29,906.07 for reimbursement of expenses pursuant to their antenuptial agreement. We affirm the trial court's judgment as modified herein.
This case is before us for a third time and follows our remand to the trial court to determine the amount of expenses appellant claims to have paid contrary to the parties' antenuptial agreement. We initially review the history of this case and set forth additional facts contained in the record that are relevant to our discussion and disposition on the issue of appellant's expenses.
The parties married on March 18, 1989, the day after they signed an antenuptial agreement.[1] Both parties had been married previously, and appellant had a son from her previous marriage who was then sixteen years old.
Pursuant to section nine of the antenuptial agreement, Dever agreed to pay certain expenses of appellant during the marriage; section ten provided that he had no contractual liability to support appellant's son. Section twenty-three provided that if a divorce was granted appellant would receive a lump sum payment and $4,000 per month for a period of time after the date of the divorce decree "in lieu of all other claims, demands, actions, causes of action, or rights whatsoever which she may have arising out of the marital relationship not specifically set forth in the other provisions of the agreement."
Dever, owner of Automanage, Inc., a multi-million dollar corporation, had numerous car dealerships and real estate holdings in several states and brought considerable assets and debts to the marriage. By contrast, appellant possessed assets of jewelry, clothing, fur coats, household items, an inheritance from her mother,[2] and a trust for her son.
Although appellant claims she has not held a job for more than twenty-five years, Dever placed appellant on the payroll of his company after the parties met in 1981. The record does not reveal the nature of appellant's employment with the company, her salary, or the date her employment terminated. Beginning in 1986, the parties lived together for three years in Dever's home on Grandin Road ("Grandin house") in Cincinnati, Ohio, valued at more than one million dollars.
Shortly after the marriage, Dever experienced financial problems with his business. To avoid foreclosure of loans and attachment of assets by Huntington Bank, Dever sold most of his car dealerships and real estate holdings to pay down the debt. Dever also transferred an undivided one-half interest in the Grandin house and a Merill Lynch brokerage account ("ML investment account") to himself and appellant as joint tenants with rights of survivorship.
In August 1992, Dever purchased a house on Kenwood Road in Cincinnati, Ohio ("Kenwood house") with funds from the ML investment account and executed the title in their names as joint tenants with rights of survivorship. Dever later paid off the mortgage and transferred his interest in the Kenwood house to appellant.
In October 1992, appellant opened a PaineWebber investment account with funds Dever gave to her. Appellant made additional deposits to this account with other funds Dever gave her and later converted the account to an annuity. ("PaineWebber annuity account").[3] In July 1993, appellant withdrew funds from the ML investment account and opened anotherPaineWebber account ("PaineWebber checking account").[4]
Upon learning of Dever's transfers to appellant, Huntington Bank threatened appellant and Dever with foreclosure if these transfers were not undone. In settling the financial problems with Huntington Bank, appellant agreed to give up her interest in the Grandin house and $400,000 from the PaineWebber checking account. Around this time, Dever reduced the amount of the twice-monthly allowance he had been giving appellant since the beginning of the marriage from $1,000 to $750. The parties sold the Grandin House and moved for a short period of time to another home before moving into the Kenwood house in August 1994. Two months later, the parties separated and Dever moved out of the Kenwood house on November 24, 1994.
Appellant continued to reside at the Kenwood house. Dever continued to give appellant $750 twice a month. Dever also paid certain bills for appellant, including utilities, real estate taxes, medical expenses, credit card debt, and her car, health, life, and homeowner's insurance premiums.
On March 13, 1996, Dever filed a complaint for divorce. Appellant responded with an answer and counterclaim for divorce on April 19, 1996, asserting that the parties' antenuptial agreement determined the division of property and the amount of spousal support to be awarded after the decree was entered. At that time, appellant moved the trial court for temporary support pendente lite pursuant to Civ.R. 75(M) without seeking an oral hearing. In her affidavit, appellant stated that the antenuptial agreement "does not make any provision for support for [her] while [they] are going through this divorce." Appellant also attached an affidavit of income, expenses, and financial disclosure requesting $6,348.14 per month to cover her expenses and disclosing assets of $156,181.70 in the PaineWebber checking account, $427,571.29 in the PaineWebber annuity account, $640.16 in her Society Bank checking account,[5] and the Kenwood house valued at $270,000. Appellant also informed the court she was not seeking attorney fees to litigate this matter as part of the temporary support order.
Dever countered by affidavit recommending that he pay appellant $3,500 per month in temporary support and continue to provide her with a car with a lease value of $400 per month and insurance of $100 per month. Dever pointed out that he had paid certain expenses for appellant totaling $18,087.72 and had been giving her $1,500 per month for a total of $25,500.[6] In determining the $3,500 amount, Dever referred to the antenuptial agreement that required him to pay $4,000 per month for a period of time after the marriage terminated. Dever also pointed out to the trial court that appellant had no mortgage payment, and alleged that some of appellant's claimed expenses, such as for clothes and taxes, were inflated, and that some of her stated expenses were not her expenses, but those of her now-adult son.
On May 8, 1996, the trial court entered temporary orders awarding temporary spousal support of $3,500 per month and ordered Dever to provide appellant with a car and pay her car, health, and homeowner's insurance premiums. After appellant conducted extensive discovery into Dever's assets, the parties stipulated to the validity of the antenuptial agreement. The parties remained financially entangled because both now claimed ownership of the Kenwood house and the two PaineWebber accounts. Appellant also maintained that Dever owed her $617,500 for her interest in the Grandin home and $400,000 from the PaineWebber checking account that she agreed to pay to Huntington Bank, and for expenses, including attorney fees, that she had paid contrary to section nine of the antenuptial agreement.
The matter was set for final hearing in June 1997. In response to appellant's request for a continuance of the hearing date, by an agreed entry filed July 22, 1997 the parties "set the date of June 30, 1997, as the termination date of the marriage for purposes of construing the duration of any subsequent spousal support payments to be made by [Dever] to [appellant] per Section 23 * * *." The entry also provided that "the current temporary spousal support order * * * shall remain in effect until the Court issues its final determination upon the completion of trial."
The matter proceeded to a final hearing on December 2 and 3, 1997. Appellant testified that exhibits 17 to 21 consisted of all of her expenses except for her attorney fees. These exhibits consisted of documentary evidence purporting to be of copies of bank statements and canceled checks from the PaineWebber checking account from November 1994 through May 1997, appellant's Society Bank checking account from November 1994 through February 1997, her son's Society Bank checking account from November 1994 through December 1995, appellant's Star Bank checking account from September 1996 through November 1997,[7] copies of some of her credit card statements, a few statements from "Miss Martha," a clothing boutique, and cancelled checks for real estate tax payments.
In its May 15, 1998 decision on divorce, the trial court awarded a decree of divorce to the parties on the grounds of incompatibility. For purposes of property division, the trial court found that "the term `during the marriage' [meant] from March 17, [sic] 1989 through July 1, 1997." The trial court also found that there was insufficient evidence to support a finding by clear and convincing evidence that Dever intended to gift to appellant the Kenwood house, the funds in the two PaineWebber accounts, or the one-half interest in the Grandin house.
The trial court held a separate hearing on May 26, 1998 concerning appellant's attorney fees. Appellant submitted exhibit 27 showing $46,977.50 in attorney fees to litigate this case that she testified were paid with funds from the PaineWebber checking account, contrary to section nine of the antenuptial agreement.
In its June 22, 1998 decree of divorce, the trial court awarded Dever the Kenwood house and the remaining balances in the two PaineWebber accounts. The trial court awarded appellant $46,977.50 in attorney fees, but did so not on the basis of need, but on the basis that appellant paid these fees out of the PaineWebber checking account which the trial court awarded to Dever. The trial court also said it would not order appellant to reimburse Dever for such expenditures. The trial court awarded appellant a $300,000 lump sum payment plus $4,000 per month in spousal support for one hundred months pursuant to section twenty-three of the antenuptial agreement. An amended decree was entered on June 30, 1998 which offset the spousal support award with the temporary support payments made from June 30, 1997 through June 1998.[8]
Appellant appealed to this court, asserting, inter alia, that the trial court erred as matter of law by not finding Dever gifted her the Kenwood house and the two PaineWebber accounts, and by not ordering Dever to pay her $241,394.73 for expenses including $46,977.50 in attorney fees under section nine.[9] This court found that Dever had gifted appellant the Kenwood house and the funds deposited in the PaineWebber checking account. Dever v. Dever (Apr. 12, 1999), Clermont App. CA98-07-050, unreported, at 19, appeal dismissed, 86 Ohio St.3d 1461 ("Dever I"). This court affirmed in part and reversed in part the trial court's judgment and remanded the case to the trial court to make a property division awarding the Kenwood house and the remaining funds in the PaineWebber checking account to appellant. Id.
Appellant then moved this court for reconsideration of our April 12, 1999 decision, asserting in part that this court failed to address the PaineWebber annuity account, and should have ordered Dever to pay her expenses, including attorney fees, that she paid from the PaineWebber checking account. On reconsideration, we found that Dever had gifted appellant the funds deposited in the PaineWebber annuity account. Deverv. Dever (July 12, 1999), Clermont App. CA98-07-050, unreported, at 7, discretionary appeal not allowed, 87 Ohio St.3d 1443 ("Dever II"). Because we had incorrectly concluded that Dever had paid appellant's expenses from the joint brokerage account (ML investment account), we remanded the issue of expenses to the trial court to determine the amount of those expenses, and directed the trial court to reimburse her for those expenses which she paid out of PaineWebber accounts covered by section nine of the antenuptial agreement.[10] Id. at 8.
On remand, the trial court set the matter for hearing and the parties filed pre-trial statements. Appellant for the first time claimed that her expenses totaled $379,403.68, including $49,908.47 in attorney fees and costs, and asked for interest pursuant to R.C. 1343.03. Appellant also proposed for the first time that Dever should receive credits for $48,262[11] for temporary support paid from May 8, 1996 through July 1, 1997, $25,500 for the $1,500 monthly payments made from November 1994 through April 1996, and $38,400 for transfers of funds between her accounts and expenses attributed to her son. According to appellant, Dever now owed her $267,241.68. Dever maintained that since November 1994, he has paid all reasonable and necessary expenses covered by the agreement. Dever also maintained that since May 8, 1996, he has provided for all of appellant's expenses pursuant to the court-ordered temporary spousal support.
One day prior to the hearing, Dever filed a motion in limine to preclude appellant from introducing new evidence outside the time period of November 1994 to May 8, 1996. The trial court denied Dever's motion and maintained that our remand order did not limit the time frame to consider evidence.
Over objections by Dever, the trial court allowed appellant to testify and introduce new evidence of purported expenses from the two PaineWebber accounts before November 1994. Appellant then presented the same evidence as previously offered from November 1994 through May 8, 1996 and an additional amount of $6,679.32 from the PaineWebber checking account that she did not claim as expenses at the 1997 hearing.[12] Over continuing objections by Dever, the trial court declined to hear any further evidence on expenses after May 8, 1996, but allowed appellant and Dever to proffer exhibits and testimony. The proffered evidence consisted primarily of evidence that was already part of the record from the December 1997 final hearing and May 1998 hearing for attorney fees and some additional copies of bank statements for withdrawals and canceled checks from the PaineWebber checking account after May 1997 and the Star Bank checking account after November 1997.
By its January 4, 2000 decision and entry, the trial court ordered Dever to pay $29,906.07 to appellant for expenses she paid from November 1994 through May 1996 out of her PaineWebber checking account. The trial court also found that the parties agreed that appellant's expenses would be covered after May 8, 1996 by the temporary spousal support payment of $3,500 per month. Appellant appeals raising two assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT/WIFE BY FAILING TO FOLLOW THE ORDER ON REMAND TO DETERMINE THE AMOUNT OF WIFE'S EXPENSES THAT HUSBAND IS OBLIGATED TO PAY PURSUANT TO SECTION NINE OF THE ANTENUPTIAL AGREEMENT.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT/WIFE BY AWARDING HER ONLY $29,906.07 WHEN SHE WAS CONTRACTUALLY ENTITLED TO A REIMBURSEMENT OF $267,241.68.
We will address the assignments of error together.
Appellant argues that the trial court failed to enter judgment in her favor for the full amount owed by Dever under section nine.[13]
Appellant contends Dever owes her $267,241.68 ($379,403.68 minus credits of $112,162). Alternatively, appellant contends that Dever owes her $203,132.33 ($241,374.33 minus a credit of $48,262).
 I. Remand Order
To resolve appellant's assignments of error, we must first determine if the trial court followed our mandate on remand. In our disposition of the issue of appellant's expenses on reconsideration, we re-examined the record and stated that:
 [t]his court incorrectly concluded that appellant's expenses were paid from the parties' joint brokerage account. Upon reconsideration, we remand the issue of expenses to the trial court to determine the amount of appellant's expenses and the sources she used to pay her expenses. Further, if it is determined that appellant paid her expenses from her Paine Webber [sic] accounts, then pursuant to the [ante]nuptial agreement, Dever is obligated to reimburse appellant.
 Dever II at 8.
 Our remand order instructed the trial court to determine the amount of expenses appellant paid contrary to section nine. The trial court was to determine: (1) what expenses appellant paid from the PaineWebber accounts; and (2) which of the expenses she paid from the PaineWebber accounts were within the contemplation of section nine of the antenuptial agreement.[14] Dever II at 8.
The evidence of appellant's expenses before this court at the time of her first appeal consisted of her various accounts and her son's account from the date the parties separated, November 1994, until the date the parties agreed the marriage terminated, June 1997. One exception was the Star Bank checking account showing her expenditures through November 1997. The foregoing accounts showed expenditures for attorney fees, necessaries, her son's expenses, and items such as gifts, entertainment, bank fees, and numerous cash withdrawals. In addition to the funds in the PaineWebber accounts, appellant had funds in the Society Bank and Star Bank checking accounts, which came from the $1,500 monthly payments and the $3,500 temporary support payments by Dever, child support payments for her son, and funds from the PaineWebber checking account. Additionally, appellant submitted a copy of her counsel's record of attorney fees totaling $46,977.50 through May 1998 that she testified were paid with funds from the PaineWebber checking account.
After remand, appellant's evidence consisted of all the previously submitted evidence, plus expenditures from the PaineWebber accounts before November 1994, expenditures from the PaineWebber checking account that she did not claim as expenses at the 1997 hearing, and proffered exhibits and testimony about her various accounts showing expenditures through June 1998, the date of the amended divorce decree.
On remand, the trial court found that appellant was entitled to $29,906.07 in expenses that she paid from the PaineWebber checking account from November 1994 to May 8, 1996 contrary to section nine. The trial court found that the parties agreed that appellant's expenses would be covered by the $3,500 per month temporary support payments after May 8, 1996. The trial court made no specific finding concerning an award of attorney fees.
In its initial decision, the trial court found that the PaineWebber accounts were Dever's separate property. Because the trial court found Dever provided all the funds for any expenditures by appellant, it did not make any determination on the amount or validity of expenses under section nine. However, the trial court awarded appellant $46,977.50 in attorney fees. After appellant appealed this decision, this court found the two PaineWebber accounts were appellant's separate property and remanded the issue of her expenses including attorney fees to determine only the amount she paid from her separate property contrary to section nine. Dever II at 8.
In the present appeal, appellant contends that the trial court abused its discretion by following our remand instructions and determining the amount of her expenses. According to appellant, because this court used the words "sources," and "pursuant to antenuptial agreement," we did not limit the inquiry to her expenses and she was entitled to present evidence from all her accounts up to June 30, 1998, the date of the amended divorce decree.
On remand, "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." Nolan v. Nolan (1984), 11 Ohio St.3d 1, syllabus. "[T]he trial court is without authority to extend or vary the mandate given." Id. at 4. Moreover, "[u]pon remand from an appellate court, the lower court is required to proceed from the point at which the error occurred." State ex rel. Stevenson v. Murray (1982), 69 Ohio St.2d 112,113.
Although we acknowledge that this court used the very general term "sources" in our remand order without a clear explanation, nothing in our opinion supports the view that we ordered Dever to pay for all of appellant's expenses from all other accounts. If this court had intended that appellant be reimbursed for expenses she paid from all other accounts, we would have said so and not expressly limited our remand instructions by stating, "if it is determined that appellant paid her expenses from the Paine Webber [sic] accounts, then pursuant to the [ante]nuptial agreement, Dever is obligated to reimburse appellant."Dever II at 8.
Further, our remand order did not state that the trial court was limited to the existing record in its calculation of the total amount of expenses. Thus, we did not expressly limit our remand order to the evidence introduced at the prior proceedings. Implicit in this court's remand order was that the trial court as the trier of fact was free to consider any additional evidence it found relevant and determine its weight and credibility to reach an accurate result.
We therefore find that the trial court did not disregard this court's remand order. The trial court decided the amount that Dever owed appellant from the PaineWebber accounts under section nine in light of other sources of funds appellant received from Dever, which was consistent with the remand order.
 II. Res Judicata
Appellant argues that the trial court erred as a matter of law in denying her the payment of her expenses, including attorney fees, because both issues have already been decided and reconsideration is barred byres judicata. Appellant claims that the trial court and this court inDever I had already decided that her expenses including attorney fees were $241,394.33. According to appellant, Dever waived his right to challenge her evidence of expenses on remand because he did not appeal from the original judgment.
The doctrine of res judicata provides that a final, valid judgment on the merits is conclusive as to all claims which were or could have been litigated in the initial suit. Grava v. Parkman Twp. (1995),73 Ohio St.3d 379, 382. Res judicata requires a final judgment on the merits and a new action to be filed.
The trial court's initial decision that appellant's expenses including attorney fees were paid by Dever was based upon its incorrect finding that the PaineWebber accounts belonged to Dever. This court also had incorrectly concluded that Dever had paid appellant's expenses from the joint brokerage account (ML investment account). Dever II at 8. At the time, the trial court had not made any factual findings addressing the validity of any of the expenses presented under section nine or determined an amount.
The effect of a reversal and an order of remand is to reinstate the case to the docket of the trial court in precisely the same condition as before the error occurred. See Armstrong v. Marathon Oil Co. (1987),32 Ohio St.3d 397, 418; Wilson v. Kreusch (1996), 111 Ohio App.3d 47,51. Therefore, after our decision in Dever II, there was no final judgment on the merits as to the issue of appellant's expenses including the award of attorney fees, rendering the issue of res judicata
inapplicable in this matter. Accordingly, we find that appellant's argument has no merit.
 III. Award of Attorney Fees
There are conflicting judgments concerning an award of attorney fees. The trial court awarded appellant attorney fees in the divorce decree and made no award of attorney fees in its remand decision. A decision whether to award attorney fees under R.C. 3105.18(H)[15] rests with the sound discretion of the trial court. Balog v. Balog (June 6, 1997), Warren App. Nos. CA96-08-077, CA96-08-081, CA96-09-086, unreported, at 5, citing Rand v. Rand (1985), 18 Ohio St.3d 356, 359.
The record reveals that the decision to hold a hearing on attorney fees was made after the trial court found that the disputed assets (the PaineWebber accounts and the Kenwood house) were Dever's separate property. At that time, although there was some discussion with the trial court concerning its ability to award attorney fees under R.C. 3105.18(H), appellant's primary argument to the trial court for attorney fees was based upon section nine. The record further reveals that the trial court intended its award of attorney fees in the divorce decree to be a division of property based upon its wrongful allocation of the PaineWebber accounts as opposed to an intent to award attorney fees pursuant to R.C. 3105.18(H). Although the trial court awarded appellant attorney fees, the trial court did not order Dever to pay appellant any amount of money. Rather, the trial court considered that appellant had used funds in the PaineWebber checking account to pay attorney fees and was merely relieving her of any obligation to repay Dever the funds that she expended. Additionally, the trial court did not make the requisite findings to support an award of attorney fees under R.C. 3105.18(H).
Further, appellant appealed the award of attorney fees as part of the expenses she paid contrary to section nine. Appellant never argued to this court that she should be reimbursed on the basis of R.C. 3105.18(H). As previously discussed, there was no final judgement on the award of attorneys fees after this court remanded the issue of her expenses that included attorney fees. Implicit in our remand order was for the trial court to consider its prior award of attorney fees in light of the fact that this court had awarded appellant both PaineWebber accounts and the Kenwood home and her argument that attorney fees were covered by section nine. At the time of the remand hearing, the PaineWebber accounts and the Kenwood house had a combined value of more than one million dollars. As appellant argued at the remand hearing and in her present appeal that the attorney fees were covered by section nine, and in light of the fact that appellant now has assets valued at more than one million dollars, we find that the trial court did not abuse it discretion by not awarding attorney fees in its remand decision.
 IV. Section Nine and Contract Analysis
Appellant contends that the trial court erred as a matter of law by not applying contract analysis to section nine of the antenuptial agreement. Appellant argues that the trial court abused its discretion by limiting reimbursement to: (1) certain types of expenses; and (2) the PaineWebber checking account from November 1994 through May 8, 1996.
When reviewing the decision of a trial court, an appellate court "will not reweigh the evidence introduced in a trial court; rather, [we] will uphold the findings of the trial court when the record contains some competent evidence to sustain the trial court's conclusions. In addition, we will indulge in all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law. When a trial court, sitting without a jury, determines an issue but does not make separate findings of fact and conclusions of law, a reviewing court will presume the validity of that judgment as long as there is evidence in the record to support it." (Citations omitted.) Fletcher v. Fletcher
(1994), 68 Ohio St.3d 464, 468.
"An antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth in such instrument." Gross v. Gross (1984), 11 Ohio St.3d 99, 102. Generally, the law of contracts applies to the interpretation and application of antenuptial agreements. Id.; Fletcher, 68 Ohio St.3d at 467.
The interpretation of a contract that is clear and unambiguous is a question of law, and no issue of fact exists to be determined. State exrel. Parsons v. Fleming (1994), 68 Ohio St.3d 509, 511. Questions of law are reviewed de novo. Long Beach Assn., Inc. v. Jones (1998),82 Ohio St.3d 574, 576.
In addressing the language of a written contractual agreement, the primary objective of a court is to "ascertain and give effect to the intent of the parties." Foster Wheeler Enviresponse, Inc. v. FranklinCty. Convention Facilities Auth. (1997), 78 Ohio St.3d 353, 361. Courts must "attempt to give effect to each and every part of [the contract], * * * and avoid any interpretation of one part which will annul another part." Id. at 363, citing Legler v. United States Fid. Guar. Co.
(1913), 88 Ohio St. 336. Accordingly, courts may interpret an unambiguous, yet doubtful, provision to give it meaning and purpose when any other interpretation would render the provision meaningless. Foster
at 362.
In the present case, section nine is titled "liability for debts" and provides that
 [t]he debts contracted by each party prior to the marriage of the parties are to be paid by the party who shall have contracted them, and the property of the other party shall not in any respect be liable for payment thereof. During such time as husband and wife are married, husband agrees to be financially responsible for and pay all expenses of wife relating to her food consumption, lodging, medical care, joint and personal travel, clothing and apparel expenses and miscellaneous items of personal need.
 Appellant has maintained throughout these proceedings that Dever was contractually liable to pay all of her purported "expenses," including attorney fees to litigate this matter, pursuant to section nine. Specifically, appellant relies upon the definition of "necessaries," and argues that "personal need," taken in its proper context due to her station in life and lifestyle, requires Dever to pay for these expenses. Appellant argues that the trial court improperly disallowed such "necessaries" as attorney fees, entertainment, gifts, and flowers. Dever maintains that he has no obligation to pay for such expenses as gifts, donations, and improvements to the Kenwood house, numerous cash withdrawals without an accounting of those funds, and attorney fees.[16] In addition, Dever has maintained throughout these proceedings that his liability for appellant's attorney fees to litigate this matter is covered under section twenty-three of the antenuptial agreement.[17]
On these facts, we find that "personal need" should not be construed in isolation from the rest of the language used in section nine or other provisions of the antenuptial agreement. The parties followed the term "all expenses" with the specific words "relating to her" and enumerated a series of items (food consumption, lodging, medical care, joint and personal travel, clothing and apparel expenses and miscellaneous items of personal need) that define and limit the expansiveness with which the more general term "all expenses" may be construed. See Foreclosure of LiensFor Delinquent Taxes v. Parcels of Land Encumbered With Delinquent TaxLiens No. (May 28, 1999), Clark App. No. 98CA75, 1999 Ohio App. WL 335131, at *6, unreported. Reading section nine in context with the other provisions in the antenuptial agreement, it cannot be construed in the self-serving, expansive manner suggested by appellant to include all of her expenditures and without any limitation on type or amount.
Part B of section three of the antenuptial agreement sets out the intent of the parties and provides that "[Dever] intends and desires to provide adequately and fairly for [appellant] and her child by a previous marriage as set forth herein." Section thirteen limits Dever's liability for income taxes if appellant's income becomes substantial, in which event each must contribute a fair share. Section sixteen, entitled "costs and expenses," provides that Dever shall pay all the costs and expenses associated with the preparation and execution of the antenuptial agreement. At the May 1998 hearing on attorney fees, both appellant and her counsel claimed that Dever paid all attorney fees for appellant under section nine and never referred to section sixteen.[18]
Moreover, section twenty-three of the antenuptial agreement provides appellant with a $300,000 lump sum payment and $4,000 per month for one hundred months after the date of the decree. This award was "in lieu of all other claims, demands, actions, causes of action, or rights whatsoever which she may have arising out of the marital relationship." This provision also provides that "[a]t no time shall [appellant] make, attempt to make, or have any claims for any additional amounts except those specifically provided for under the terms of this agreement."
From the language employed in section nine and the other provisions, we find that the parties intended a more restrictive meaning than argued by appellant as to the type and amount of debts incurred by appellant that Dever would be contractually liable for during the marriage. To find otherwise would render the specific types of expenses enumerated in section nine and the expressed intent of the parties meaningless. SeeFoster Wheeler Enviresponse, 78 Ohio St.3d at 362.
The trial court offered no conclusions of law on the interpretation of section nine, other than making a finding that certain expenses such as flowers and gifts were not covered. However, a review of the record sheds some light on its rationale. Clarifying the basis for the awarded amount of $29,906.07, the trial court listed all the checks and their amounts that it found to be covered by section nine. The total of such expenses allowed by the trial court includes:
real estate taxes $ 3,341.34
house repairs 2,668.60
paint 149.00
yard work 1,120.00
mulch 142.28
tree work 2,853.88
landscaping 3,692.50
black top driveway 1,800.00
Stanley steamer 142.63
Madeira storage 70.00
CGE 301.44
Cincinnati Bell 173.25
CBLD 137.18
Warner cable 37.31
various credit cards 6,303.35
Lazarus 70.66
car rental 131.75
hair 70.00
cosmetics 75.58
Equitable life insurance 757.50
Aetna casualty 167.00
checks payable to cash 1,800.00
cash withdrawal 2,594.32
attorney fees 647.50
Dr. Herd 559.00
donation 10.00
Total 29,906.07
Upon our review of the canceled checks, we find that the trial court made several clerical errors. Check number one hundred one for $552.58 was listed as $552.52, check number one hundred thirteen for $105 was listed as $500, and check number two hundred for $135.50 was not included for yard work while another check for the same day and same expense was allowed. Therefore, the modified amount of expenses allowed is $29,646.63.
The expenses the trial court disallowed under section nine were for entertainment, gifts, and flowers. The trial court allowed reimbursement for $647.50 in attorney fees paid to resolve a financial problem with Huntington Bank. While the record is silent as to why the trial court included these attorney fees, a fair inference to draw is that the problem was a joint problem of the parties. The trial court disallowed reimbursement for all attorney fees to litigate the instant matter.
Under the language of section nine, we find that Dever had no obligation to pay for items such as gifts, flowers, and entertainment, which reflect items for personal pleasure rather than items of personal need. Nor do we find that Dever contracted himself to be liable under section nine for appellant's attorney fees to litigate a matter against him. There was a substantial legal basis for Dever to insist that appellant's attorney fees to litigate this matter was covered by the $300,000 lump sum award under section twenty-three as a claim arising out of the marriage. We also find that there was no basis established to award appellant attorney fees under R.C. 3105.18(H). We therefore find that there is competent and credible evidence to support the trial court's judgment that Dever was not contractually liable under section nine for such expenses as flowers, gifts, entertainment, and attorney fees to litigate this matter. See Fletcher, 68 Ohio St.3d at 468.
 V. Other Evidence of Expenses
Appellant argues that Dever's obligations under the antenuptial agreement were not just limited to the PaineWebber checking account from November 1994 through May 8, 1996. Specifically, appellant argues that this court ordered Dever to reimburse her for expenses paid from all her various accounts until the date of the divorce decree, not just the PaineWebber checking account for a limited period of time. Appellant further argues she never agreed to waive her contractual right under section nine for temporary support of $3,500 per month to cover her expenses after May 8, 1996 until the date of the divorce decree.
Appellant's own statements to the trial court and this court support the trial court's decision. In her October 2, 1998 appellate brief in the first appeal, appellant argued that "[she was] divorced on June 22, 1998," and "[u]ntil that date, [she] incurred expenses totaling $241,394.73 including attorney fees." In her motion for reconsideration and reply memorandum, appellant maintained that she paid all of these expenses from her PaineWebber checking account contrary to section nine. Additionally, in her affidavit to the trial court in which she asked the trial court to order temporary support to cover her expenses, appellant asserted that the antenuptial agreement made no provision for any support during the pendency of the divorce.
Appellant attempts to counteract her previous statements to the trial court and this court by arguing that she relied on her expectation that she would be reimbursed for her expenses according to the provisions of section nine, which she claims are broader than those of the temporary support order. She also attempts to counteract her failure to object to or request a hearing at the time the trial court ordered temporary support by arguing that the trial court made the order under its authority pursuant to Civ.R. 75(M)[19] without knowledge of the existence of the antenuptial agreement.
However, more than a mere waiver is at issue when an appellant invites the alleged error by making statements to a court and then seeks reversal of a judgment based upon these statements. Under the doctrine of "invited error," it is well-settled that "a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." State ex rel. Smith v. O'Connor (1995),71 Ohio St.3d 660, 663, citing State ex rel. Fowler v. Smith (1994),68 Ohio St.3d 357, 359. See, also, Lester v. Leuck (1943), 142 Ohio St. 91, paragraph one of the syllabus. As the Ohio Supreme Court has stated:
 [t]he law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted. It follows, therefore, that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible.
 Lester at 92-93, quoting State v. Kollar (1915), 142 Ohio St. 89,91.
In her own affidavit, appellant referred to the existence of the antenuptial agreement. Likewise, Dever referred to the existence of the antenuptial agreement when, in recommending the amount be set at $3,500 per month, he referred to the $4,000 spousal support that he was obligated to pay for a period of time after the date of the divorce decree under section twenty-three. Although it is unclear whether the trial court knew of the provisions under section nine at any time before the December 1997 final hearing, appellant may not, either intentionally or unintentionally, induce or mislead the trial court to determine the amount of her expenses without reference to section nine and then seek a reversal of the judgment on appeal. See Smith, 71 Ohio St.3d at 663;Lester, 41 Ohio St. at 93. Appellant had a "duty of vigilance" to challenge any potential prejudice at the time it occurred. See Lester at 92. Accordingly, we find that appellant cannot now argue in this court that she was prejudiced or had a clear legal right for the trial court to consider evidence of her expenses to the date of the divorce decree or from her other accounts. See Smith at 663; Lester at 93.
We note that the trial court allowed appellant to present evidence of expenses prior to November 1994 from the two PaineWebber accounts but failed to reimburse her for any of those expenses. Appellant claimed expenses of $49,881.83 from the PaineWebber checking account that consisted of a $6,000 cash withdrawal, a $9,766.63 transfer to another PaineWebber account that was not her annuity account, $25,000 for house plans, three checks for cash totaling $9,000, and a brokerage fee of $85. From the PaineWebber annuity account, appellant sought reimbursement for a $20,000 withdrawal and $19.25 for an account fee.
By contrast, appellant's testimony suggests that she never had any reason to withdraw money from these accounts for her expenses.[20] Nor did she identify these as any of her purported expenses in her exhibits 17-21 submitted at the December 1997 final hearing. Based upon appellant's own testimony and the nature of these expenses, we find there was some competent, credible evidence to support the trial court's decision not to reimburse her for these expenses under section nine. SeeFletcher, 68 Ohio St.3d at 468.
To the extent that the trial court did not reimburse appellant for any expenses she paid out of other accounts or from the PaineWebber checking account after May 8, 1996, we find no error since the fact remains that appellant herself invited such a ruling. See Smith,71 Ohio St.3d at 663; Lester 41, Ohio St. at 92-93. According to appellant, at the December 1997 final hearing, any cash withdrawal or any other type of expenditure was covered under section nine as her personal living expenses. On remand, she now argues additional expenses that she could have presented at the December 1997 final hearing or asked the court to determine after the date of the divorce decree. She also concedes that some of these expenses were for her son, and many of her expenses were not paid with funds from the PaineWebber checking account. Even after the trial court allowed her a second chance to present evidence and proffer testimony and evidence, appellant did little to clarify these matters. To the extent she does now, it contradicts her testimony at prior proceedings where she claimed that the documentary evidence showed all her personal expenses covered by section nine.
Having thoroughly reviewed the record and in light of appellant's incomplete accounting of her expenses, her often evasive testimony regarding her numerous cash withdrawals, the nature of some of her expenses, her inconsistent arguments, and her attempt to make Dever pay twice for many of her expenses, we find there is competent credible evidence to support the trial court's judgment. Many of appellant's expenses reflect personal choices and not the specific expenses covered by section nine. The trial court's finding that the parties agreed to $3,500 per month as a fair and adequate amount for appellant's expenses is supported by the record. Appellant failed to raise any objections or request a hearing concerning that finding. Further, the trial court could have found that appellant's testimony was less than credible concerning the need to expend more than $3,500 a month since she had no mortgage and Dever provided her with a car and paid her car, health, and homeowner's insurance premiums. Under the terms of the antenuptial agreement, Dever had no obligation to pay for an expense twice, pay appellant's son's expenses, or pay for items that reflected her personal choices such as gifts and entertainment as opposed to items of personal need.
Finally, to avoid further litigation on this matter, we note that appellant asks this court in the conclusion of her brief to award her interest on the judgment. Appellant claims in her statement of facts that she has consistently asked that she be awarded statutory interest pursuant to R.C. 1343.03.[21] Appellant does not cite to any portions of the record supporting her statement. See App.R. 16(A)(6); Loc.R. 11(B)(2). The record reveals that appellant first mentioned the issue of prejudgment interest in her motion for reconsideration. Appellant did not brief the issue as an assignment of error or as an issue for review in either her first appeal or the present appeal. See App.R. 12(A)(1)(b); App.R. 16(A)(3)-(4); Loc.R. 11(B)(3). The Ohio Supreme Court in Hawleyv. Ritley (1988), 35 Ohio St.3d 157, established that the failure to separately brief and/or argue an assignment of error pursuant to App.R. 12(A) can result in the overruling of the particular unbriefed error.Id. at 159. Accordingly, the issue of interest is not properly before this court, and is therefore overruled.
Based upon the foregoing analysis, we find that the record contains competent, credible evidence to sustain the trial court's conclusions. As such, we do not find the trial court exceeded our mandate on remand, erred as a matter of law or abused its discretion when it determined appellant's expenses to be $29,906.07. We therefore find that substantial justice was done the complaining party. See Midwest Paper SpecialtiesCo. v. Holler (June 2, 1995), Lucas App. No. L-94-228, unreported. Pursuant to App.R. 12(B),[22] the order of the trial court requiring Dever to pay appellant $29,906.07 is hereby modified to require Dever to pay appellant $29,646.63. We enter judgment in favor of appellant in the amount of $29,646.63. If Dever has paid the $29,906.07, then appellant shall pay Dever $259.44. Accordingly, appellant's assignments of error are overruled.
Judgment affirmed as modified.
YOUNG, P.J., and VALEN, J., concur.
 __________________ WALSH J.
[1] In Dever v. Dever (Apr. 12, 1999), Clermont App. No. CA98-07-050, unreported, at 1, this court incorrectly stated that the parties were married on March 19, 1989 and that the antenuptial agreement was signed on March 18, 1989. The record reveals that the parties signed the antenuptial agreement on March 17, 1989 and married on March 18, 1989.
[2] The record does not reveal the amount of appellant's inheritance from her mother.
[3] This account was referred to in our previous opinion as the "second" PaineWebber account. See Dever v. Dever (July 12, 1999), Clermont App. CA98-07-050, unreported.
[4] The bank statements from this account reveal that appellant deposited $553,492.81 into this account in July 1993. By contrast, her testimony indicates that she deposited $610,000.
[5] Appellant used a Society Bank checking account to manage her monthly allowance from Dever.
[6] Dever's exhibit 9 shows a total of $35,423.18 for expenses he paid for appellant from January 1995 through June 1996. Our calculation of the listed expenses paid by Dever reveals a total of $32,684.72. In addition, Dever indicated $1,037.50 for the lease value of the car per month rather than the $500 stated in his affidavit for the car and insurance. Although appellant did not dispute these figures at trial, neither party reconciled the discrepancies. The $32,684.72 total is lowered if $500 is substituted for the car and car insurance for a total of $18,087.72 ($8,460.28 for 1995 and $9,627.44 in 1996). In his affidavit, Dever estimated that these expenses he paid for appellant in 1995 were approximately $8,600 which is consistent with our calculation of $8,460.28 for 1995.
[7] The record reveals that appellant closed her son's Society Bank account in December 1995 and her Society Bank checking account in February 1997. Appellant opened a Star Bank checking account in October 1996. Appellant deposited her son's child support payments and the $1,500 and $3,500 monthly payments for support from Dever, and transferred funds from the PaineWebber checking account into these accounts. The record also reveals that appellant's list of exhibits submitted at the 1997 final hearing and attached as Exhibit G to her brief indicate the Star Bank statements were to May 1997, not November 1997.
[8] The amended divorce decree did not expressly state the time frame that temporary support order would offset the spousal support award under section twenty-three. From our review of the record, it is clear that the offset was effective from June 30, 1997, as this was the termination date of the marriage for purposes of construing the duration of any subsequent spousal support payments.
[9] It is unclear from the record exactly what evidence in the record constituted the amount of $241,394.73. The first time that this figure is referred to is in appellant's brief and she cites to exhibits 17-21 and 27. Review of these exhibits reveals there are duplicated expenses. For example, exhibit 21 consists of copies of some credit card bills, real estate taxes, and bills from "Miss Martha," a clothing boutique. These same expenses were paid from checks written from the various accounts in exhibits 17, 18, 19, and 20. Exhibits 17, 18, and 20 also include checks for attorney fees that were included in exhibit 27. We also note that appellant did not present any evidence of her expenses for October and November 1995 from her Society Bank or PaineWebber checking accounts at any time during these proceedings.
[10] Appellant had argued in her brief and motion for reconsideration that all of her expenses were covered by section nine of the antenuptial agreement.
[11] Appellant bases the $48,262 on a prorated amount of $2,762 for May 1996 and $3,500 for each following month through June 30, 1997.
[12] The $6,679.32 consisted of a $2,594.32 cash withdrawal in March 1995, a $2,000 cash withdrawal in September 1996, a $2,000 cash withdrawal in January 1997, and an $85 broker's fee in May 1997 as evidenced by bank statements from the PaineWebber checking account.
[13] Appellant contends Dever should be credited for: $25,500, the sum of the monthly payments from November 1994 through April 1996; $48,242, the sum of temporary support payments from May 8, 1996 through June 30, 1997; and $38,400 for transfer of funds between two of her accounts, for a total of $112,162. Otherwise, appellant suggests Dever should be credited $48,262 against the amount she claimed in her first appeal and asserts that the trial court gave Dever this credit. However, the record indicates the credit for temporary support was against the $4,000 spousal support award pursuant to section twenty-three from July 1997 through June 1998. Notably, appellant does not suggest that Dever should be credited for $203,132.33 ($241,374.33 minus a credit of $48,262).
[14] Appellant had argued in her brief and motion for reconsideration that all of the expenses she paid were covered by section nine of the antenuptial agreement.
[15] R.C. 3105.18(H) states: "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees."
[16] At the remand hearing, Dever admitted that he owed appellant for several expenses between November 1994 to May 8, 1996.
[17] We note that section twenty-three does not expressly provide for attorney fees. However, section twenty-three provides that the $300,000 lump sum award and the $4,000 per month for one hundred months "shall constitute the entire amount(s) of support, maintenance, and/or alimony of any type to which [appellant] may be entitled to from husband" and "is to be paid to [appellant] in lieu of all other claims, demands, actions, causes of actions or rights whatsoever which she may have arising out of the marital relationship."
[18] The record reveals that appellant's counsel argued to the court at the May 1998 hearing that Dever paid appellant's attorney fees, including those associated for the preparation and execution of the antenuptial agreement, under section nine. At the hearing, the following exchange took place between appellant and her counsel:
 Have you read that portion of the prenuptial — antinuptial [sic] agreement, excuse me, which is Defendant's Exhibit 1, section 9? I'm going to hand it to you. Are you familiar with the provision of that section of the antinuptial [sic] agreement?
Yes.
 Q. And what was your understanding as to how that provision related, if at all, to Mike's — whether Mike [Dever] has an obligation toward you for your fees?
 I just — thought that he would pay them. I thought — he always paid them. He paid for the prenup [sic], the Huntington stuff. I've never paid attorney fees. I thought he would pay them. I mean he filed because of the money, because of the $200,000 and I had to get an attorney.
[19] Civ.R. 75(M) as was in effect in 1996 stated:
 Allowance of spousal support, child support, and custody pendente lite.
 (1) When requested in the complaint, answer, or counterclaim, or by motion served with the pleading, upon satisfactory proof by affidavit duly filed with the clerk of the court, the court or referee, without oral hearing and for good cause shown, may grant spousal support pendente lite to either of the parties for the party's sustenance and expenses during the suit * * * during the pendency of the action for divorce, annulment, or legal separation.
 (2) Counter affidavits may be filed by the other party within fourteen days from the service of the complaint, answer, counter-claim, or motion, all affidavits to be used by the court or referee in making a temporary spousal support order * * *. Upon request, in writing, after any temporary spousal support, * * * is journalized, the court shall grant the party so requesting an oral hearing within twenty-eight days to modify the temporary order. A request for oral hearing shall not suspend or delay the commencement of spousal support or other support payments previously ordered * * * until the order is modified by journal entry after the oral hearing.
 Civ.R. 75(M) has been amended and has been relabeled Civ.R. 75(N).
[20] At the December 1997 final hearing, the following exchange took place between appellant and her counsel:
 Prior to the time that you and Mr. Dever separated, did you have any need to withdraw money from any account?
No.
Why not?
 Well, because all my bills went to the office and I just didn't have a reason. I didn't need —.
Q. — was there any bill of yours that your husband did not pay?
No.
Did you have any need for money that he didn't give you?
A. No.
[21] R.C. 1343.03(A) states "when money becomes due and payable * * * upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, * * *."
[22] App.R. 12(B) states "[I]n * * * cases where the court of appeals determines that the judgment or final order of the trial court should be modified as a matter of law it shall enter its judgment accordingly."