OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

Fletcher, Appellee, v. Fletcher, Appellant.
[Cite as Fletcher v. Fletcher (1994),     Ohio St.3d    .]
Domestic relations -- Antenuptial agreement -- Burden of
     proving fraud, duress, coercion or overreaching is on
     party challenging agreement -- When agreement provides
     disproportionately less than party challenging it would
     have received under an equitable distribution, burden is
     on one claiming validity to show full knowledge or
     disclosure -- Party financially disadvantaged by agreement
     must have meaningful opportunity to consult with
     independent counsel.
1.  When an antenuptial agreement provides disproportionately
         less than the party challenging it would have received
         under an equitable distribution, the burden is on the
         one claiming the validity of the contract to show that
         the other party entered into it with the benefit of
         full knowledge or disclosure of the assets of the
         proponent.  The burden of proving fraud, duress,
         coercion or overreaching, however, remains with the
         party challenging the agreement.
2.  When an antenuptial agreement provides disproportionately
         less than the party challenging it would have received
         under an equitable distribution, the party financially
         disadvantaged must have a meaningful opportunity to
         consult with independent counsel.
     (No. 92-2117 -- Submitted October 20, 1993 -- Decided
March 23, 1994.)
     Appeal from the Court of Appeals for Montgomery County,
No. 12942.
     Appellant, Dyane L. Fletcher ("Dyane"), and appellee,
Kenneth W. Fletcher ("Kenneth"), were married on April 29,
1983.  One day before the wedding, the parties executed a
prenuptial agreement.  After seven years of marriage, Kenneth
filed a complaint for divorce and for enforcement of the
prenuptial agreement.  Dyane's answer asserted that the
agreement was obtained by fraud and duress and was therefore
invalid.
     Kenneth and Dyane met in 1982, while each was married to

another person.  In early 1983, they discussed marriage and by April 1983, both had terminated their then-current marriages. At that time, Dyane was represented in her dissolution by attorney Paul J. Winterhalter, and he and another attorney from the same law firm, Donald Schweller, represented Kenneth in his divorce.  Schweller also drafted the prenuptial agreement that Kenneth and Dyane signed.

At the hearing to determine whether the prenuptial agreement was valid, conflicting testimony was offered about the circumstances of the preparation and execution of the agreement.  Kenneth testified that he had discussed the agreement and its contents with Dyane prior to its execution on April 28.  Dyane denied there had been any prior discussions. Dyane also denied reading the agreement before she signed it. Attorney Schweller testified that Dyane had appeared to read the agreement before signing it.  Attorney Winterhalter stated that he had explained to Dyane her rights in a divorce when he was representing her in her prior dissolution.  Dyane denied this.  Dyane testified also that attorney Schweller told her at the signing that, in the event the marriage to Kenneth was terminated, whatever she and Kenneth accumulated together would be "divided."  Schweller denied stating this.

The parties agreed on some facts.  It was uncontroverted that attorney Schweller told Dyane that she could have legal counsel and that she declined.  It was also agreed that although attorney Schweller in some fashion orally explained the contents of the agreement, he did not fully delineate to Dyane at the April 28 signing exactly what rights would accrue to her from the marriage and how the agreement would affect those rights.

Based on the evidence and legal authority submitted, the trial court upheld the agreement.  The court of appeals affirmed except as to the part of the judgment that denied spousal support, which it reversed, and remanded the cause for a determination of support.

The cause is now before this court upon the allowance of a motion to certify the record.

Rogers & Greenberg, Stanley Z. Greenberg and L. Anthony Lush, for appellee.
Crew, Buchanan & Lowe and Charles D. Lowe, for appellant.

Moyer, C.J.    It is well settled in Ohio that public policy allows the enforcement of prenuptial agreements.  Gross v. Gross (1984), 11 Ohio St.3d 99, 11 OBR 400, 464 N.E.2d 500, paragraph one of the syllabus.  "Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce."  Id. at paragraph two of the syllabus.  These conditions precedent to the enforcement of a prenuptial agreement arise in part from the fact that parties who have agreed to marry stand in a fiduciary relationship to each other.  Id. at 108, 11 OBR at 409, 464 N.E.2d at 509; Juhasz v. Juhasz (1938), 134 Ohio St. 257, 12 O.O. 57, 16

N.E.2d 328, paragraph one of the syllabus.

Long before Gross, this court held that prenuptial agreements controlling the distribution of assets upon the death of a spouse may be enforceable. Juhasz, supra; Hook v. Hook (1982), 69 Ohio St.2d 234, 23 O.O.3d 239, 431 N.E.2d 667. In Juhasz, this court held that when a prenuptial agreement provides that one spouse shall receive an amount that is wholly disproportionate to the amount he or she would take under the law, the spouse asserting the validity of the contract bears the burden to show that it was executed after full disclosure of the nature, value and extent of the proponent's property or that there was full knowledge thereof. Id., 134 Ohio St. 257, 12 O.O. 57, 16 N.E.2d 328, paragraph three of the syllabus. Under Juhasz, a prenuptial contract would be enforced upon the death of a spouse if it was voluntarily entered into and if the provision for the surviving spouse was fair and reasonable under all the circumstances. Id. at paragraph two of the syllabus. If the provision is "wholly disproportionate," the agreement will still be enforced if it was voluntarily entered into with full disclosure or knowledge. Id. at paragraph four of the syllabus.

In determining the enforceability of prenuptial agreements upon separation or divorce, the Gross court refined and elaborated on the Juhasz voluntariness test. The court acknowledged that modern trends in marriage and divorce and changing social attitudes compelled the conclusion that these types of agreements tend to promote marriage, rather than encourage divorce. 11 Ohio St.3d at 105-106, 11 OBR at 405-406, 464 N.E.2d at 505-506. Nevertheless, we forged a three-part test for enforceability, set forth supra, to ensure that the economically superior party, who typically proposes the antenuptial agreement, does not take unfair advantage of his or her prospective spouse.

The first element of the Gross test requires that the agreement be freely entered into without fraud, duress, coercion or overreaching. Those terms were defined according to their generally accepted meanings. Id. at 105, 11 OBR at 406, 464 N.E.2d at 506. "Overreaching" was specifically defined as one party outwitting or cheating the other "by artifice or cunning, or by exploiting a significant disparity in understanding the nature of the transaction ***." Id. The Gross court applied its newly announced test to the facts before it and held the agreement enforceable. The evidence in Gross was that the wife who challenged the agreement had had benefit of counsel, and that there had been full disclosure of the husband's assets. In a case decided on the same day, this court held invalid a prenuptial agreement on the basis that there had not been a full disclosure of the proponent's financial worth. Zimmie v. Zimmie (1984), 11 Ohio St.3d 94, 11 OBR 396, 464 N.E.2d 142.

Antenuptial agreements are contracts and generally the law of contracts applies to their interpretation and application. 2 Williston on Contracts (3 Ed.1959), Section 270B. Nevertheless, this court has recognized that these agreements constitute a special type of contract to which certain special rules apply. See Gross, supra. In Juhasz, for example, this court held that an agreement to marry gives rise to a

confidential relationship between the parties, and that an antenuptial agreement that creates a disproportionate allocation of property upon death shifts the burden of proving full disclosure onto the party claiming the validity of the contract.  This burden shifting is in derogation of traditional contract principles because ordinarily a party asserting the invalidity of a contract bears the burden of proving a defense to it.  See Ohio Loan & Discount Co. v. Tyarks (1962), 173 Ohio St. 564, 20 O.O.2d 168, 184 N.E.2d 374, paragraph two of the syllabus.

The first justification for this burden shifting is the fiduciary relationship of the parties.  The second justification is that antenuptial agreements negate the statutorily defined presumptive rights of a spouse to an equitable distribution of marital assets upon divorce.  R.C. 3105.171.  Thus, paragraph three of the syllabus in Juhasz remains good law and applies to prenuptial agreements made in contemplation of divorce.  When an antenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the one claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent.  The burden of proving fraud, duress, coercion or overreaching, however, remains with the party challenging the agreement.

This court will not reweigh the evidence introduced in a trial court; rather, we will uphold the findings of the trial court when the record contains some competent evidence to sustain the trial court's conclusions.  Ross v. Ross (1980), 64 Ohio St.2d 203, 18 O.O.3d 414, 414 N.E.2d 426.  In addition, we will indulge all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law.  In re Sublett (1959), 169 Ohio St. 19, 7 O.O.2d 487, 157 N.E.2d 324.  When a trial court, sitting without a jury, determines an issue but does not make separate findings of fact and conclusions of law, a reviewing court will presume the validity of that judgment as long as there is evidence in the record to support it.  Scovanner v. Toelke (1928), 119 Ohio St. 256, 163 N.E. 493, paragraph four of the syllabus.

On August 27, 1990, the trial court in the instant case rendered its decision upholding the parties' prenuptial agreement.  This decision summarized pertinent testimony, but lacked specific findings of fact.  This court must therefore affirm the trial court's determination if there is some evidence in the record to establish that the elements of Gross have been satisfied.  Although certain critical facts were in dispute, we must presume that the trial court believed the testimony that supported the enforceability of the agreement.

It is not disputed that there was adequate disclosure of Kenneth's assets.  Attached to the antenuptial agreement was a financial disclosure statement, the accuracy of which Dyane does not dispute.  Nor does Dyane assert that the agreement tended to promote profiteering by divorce.  Thus, the Gross test will operate to invalidate the agreement only if the record contains unrebutted evidence that establishes fraud, duress, coercion or overreaching.

There was evidence in the record to support the conclusion

that Dyane knew her rights incident to divorce.  Indeed, the trial court wrote, "There is no doubt in this court's mind that Judge Kern [who presided over Dyane's prior dissolution] fully questioned the parties concerning the unequal division and that first [Dyane] understood the same or Judge Kern would not have granted the dissolution."  It is agreed that Dyane was given the opportunity to consult with independent counsel, but refused.  Although the parties executed the agreement the day before the wedding, the trial court could reasonably have concluded that, because of the small size and informality of the impending wedding, it could have been postponed had Dyane wished to consult counsel.  Finally, there is some evidence from which to conclude that Dyane read the agreement and understood its contents prior to signing it.

We acknowledge that several of the circumstances of the execution of this agreement militate against its enforceability.  The contract never specifically mentioned divorce.  At least one Ohio appellate court has held an antenuptial agreement inapplicable to a divorce proceeding because its terms spoke only to the division of assets upon the death of a spouse and not to divorce.  Devault v. Devault (1992), 80 Ohio App.3d 341, 609 N.E.2d 214.  Nevertheless, the terms of the Fletchers' agreement provide in part, "[e]ach party hereby releases and discharges completely and forever the other from any and all rights of past, present and future support, division of property, *** or any other property rights, benefits or privileges accruing to either party by virtue of said marriage relationship ***."  Dyane herself testified that attorney Schweller described the terms of the agreement "[i]n the event that this marriage is terminated ***."  This evidence is sufficient for the trial court to conclude that the parties intended the agreement to apply to divorce.

In addition, the relationship between attorney Winterhalter, who had represented Dyane in her prior dissolution, and attorney Schweller, who drafted the instant agreement, may have led Dyane to place undue trust in them to protect her interests.  If the trial court had completely credited her version of events, it may well have concluded that there was overreaching.

Appellant urges this court to extend the duty that an attorney who drafts an antenuptial agreement owes to a client's unrepresented intended spouse.  Appellant urges that the Gross disclosure requirement should encompass not only the assets of the party who is proposing the agreement, but also "the rights that would accrue to the unrepresented party by reason of the marriage and how those rights are affected by the antenuptial agreement."  Appellant quotes the following language from Gross: "The parties must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement."  Gross, 11 Ohio St.3d at 108, 11 OBR at 409, 464 N.E.2d at 509.  When read in conjunction with the syllabus law of the case, however, the word "circumstances" refers not to legal rights but to assets.  Nor do we take so jaundiced a view of the relationship between prospective marriage partners as to require that the financially disadvantaged party be "read his or her rights" in

the sense of Crim.R. 11 or Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The facts of this case, however, lend some weight to appellant's argument of overreaching. The antenuptial agreement was presented to Dyane on the eve of the wedding. Although the trial court apparently found that this circumstance did not constitute coercion, it could reasonably have found otherwise. Our research has disclosed that it is a common practice to present antenuptial agreements at the eleventh hour before the wedding ceremony. See, e.g., In re Marriage of Matson (1985), 41 Wash.App. 660, 705 P.2d 817 (sample agreement first seen one week before wedding and executed on eve of same); In re Marriage of Norris (1981), 51 Ore.App. 43, 624 P.2d 636 (first presented and executed on wedding day); Lutgert v. Lutgert (Fla.App. 1976), 338 So.2d 1111 (presented and executed on day of wedding); Bauer v. Bauer (1970), 1 Ore.App. 504, 464 P.2d 710 (presented on wedding day). Prenuptial agreements are often drafted in such a way as to be nearly incomprehensible to a layperson. For this reason, we hold that when an antenuptial agreement provides disproportionately less than the party would have received under an equitable distribution, the party financially disadvantaged must have a meaningful opportunity to consult with counsel. The presentation of an agreement a very short time before the wedding ceremony will create a presumption of overreaching or coercion if, in contrast to this case, the postponement of the wedding would cause significant hardship, embarrassment or emotional stress.

Although we retain the Gross test for determining the enforceability of antenuptial agreements, we recognize that assistance of counsel may in some cases be necessary for a fully informed and considered decision to sign. The meaningfulness of the opportunity of the nonproponent party to seek counsel before executing an antenuptial agreement is, therefore, a significant element of the Gross test to determine whether coercion or overreaching occurred. Nevertheless, an agreement signed without counsel is not per se invalid, and mere regret at an unwise decision does not establish duress, coercion, fraud or overreaching.

For the foregoing reasons, we affirm the judgment of the court of appeals.

Judgment affirmed.

A.W. Sweeney, Wright and F.E. Sweeney, JJ., concur.

Douglas, Resnick and Pfeifer, JJ., dissent.

Alice Robie Resnick, J., dissenting. By confining the syllabus law of this case to instances where "an antenuptial agreement provides disproportionately less," today's majority overlooks the very essence and purpose of an antenuptial agreement. An antenuptial agreement generally affords one party less than such party would have received under an equitable distribution. Indeed, if it did not provide less, it would not be challenged. The syllabus paragraphs of the majority opinion do little to resolve the principal issue in this case, which is whether fraud, duress, coercion or overreaching by Kenneth Fletcher improperly influenced Dyane Fletcher to accede to the terms of the antenuptial agreement. Regardless of who bears the burden of proving overreaching

and/or coercion, and no matter whether Dyane Fletcher had a "meaningful" opportunity to consult with counsel, it is apparent that overreaching and coercion occurred when Dyane Fletcher executed the document at issue. For the following reasons, I respectfully dissent.

In Gross v. Gross (1984), 11 Ohio St.3d 99, 11 OBR 400, 464 N.E.2d 500, paragraph two of the syllabus, this court recognized that antenuptial agreements are enforceable in Ohio when certain preconditions are met. The Gross court supplied the following basic standard for judicial review of an antenuptial agreement: "[I]t must meet the general tests of fairness *** and must be construed within the context that by virtue of their anticipated marital status, the parties are in a fiduciary relationship to one another. The parties must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement." Id. at 108, 11 OBR at 409, 464 N.E.2d at 509. See, also, Zimmie v. Zimmie (1984), 11 Ohio St.3d 94, 98, 11 OBR 396, 400, 464 N.E.2d 142, 146 (antenuptial agreements must meet minimum standards of good faith and fair dealing).

The first condition for enforceability set forth in the second syllabus paragraph of Gross, that the agreement must be entered into freely without fraud, duress, coercion or overreaching, is most relevant for purposes of this case. In order to enter into such an agreement freely, a party must appreciate the rights he or she is forfeiting, and must nonetheless agree to give up those rights. Any ambiguities in the document setting forth the rights and responsibilities of each party must be construed against the drafter of the document. Otherwise the nondrafter of the document may ultimately forfeit far more than he or she reasonably contemplated at the time the agreement was signed.

This construction against the drafter is particularly appropriate when, as in this case, the scope and effect of the document are in dispute. Generally, when existing and known rights are involved, it will be readily apparent to the nondrafting party exactly what is being given up. However, when future rights are forfeited, the extent of the sacrifice often is not readily apparent to the nondrafting party.

In applying this rule of construction to the facts before us, it is apparent that the agreement cannot have the effect given to it by the majority. A reading of the document does not indicate the specific circumstances under which it will operate. In fact, as the majority acknowledges, the agreement does not even mention the word "divorce," nor does it mention any other term referring even vaguely to divorce, such as "termination of marriage." Nevertheless, the majority upholds the trial court's determination that the agreement is enforceable upon the divorce of the parties. The reasoning in Devault v. Devault (1992), 80 Ohio App.3d 341, 609 N.E.2d 214 (antenuptial agreement which does not explicitly mention divorce does not apply to divorce), is more persuasive to me, at least to the extent that an agreement's failure to mention the word "divorce" should be taken as a strong indication that the nondrafter of the document may not have been contemplating the exact circumstances and the specific rights being forfeited when the document was signed. Such an agreement should be

strongly suspect, because it very well may not have been "freely" entered into. Even the majority recognizes the questionable validity of this instrument when it states: "We acknowledge that several of the circumstances of the execution of this agreement militate against its enforceability."

Moreover, it is not at all clear from a reading of the agreement that it is meant to apply to property acquired after the marriage, specifically to money accruing to Kenneth Fletcher as a result of the appreciation in value of stock held by Kenneth at the time of the marriage. When the document is construed against the drafter, as is required, it becomes apparent that, if valid at all, it cannot be enforced in the manner attempted by the trial court. The agreement is so vague that Dyane Fletcher cannot be found to have freely agreed to accept such terms. The appreciation in value of the stock is property acquired during the course of the marriage, through the combined efforts of husband and wife, and should be subject to equitable distribution at the termination of the marriage. To deny Dyane the right to share in this property ignores the contributions she made during the course of the marriage. Try as I may, I can find no language in the document which, in any more than the most vague manner, provides that Dyane Fletcher agrees to forfeit any and all future rights to such property.

Furthermore, other considerations also support the determination that this agreement should not be enforced. Even though Dyane Fletcher declined to have an independent attorney read the document before she signed it, she was not aware of the reasons an attorney should be advising her. Under the circumstances of this case it is amazing that the majority apparently believes that because Dyane had just gone through a dissolution, she knew all the legal ramifications of the antenuptial agreement she signed. I further question whether she had a "meaningful" opportunity to consult with counsel. She did not freely enter into this agreement because the vague wording of the document prevented her from realizing she was relinquishing her claims to property acquired during the marriage. Kenneth Fletcher exploited a significant disparity in Dyane's understanding of the nature of the transaction in order to accomplish a certain known result. Clearly, this was overreaching within the meaning of Gross. See 11 Ohio St.3d at 105, 11 OBR at 406, 464 N.E.2d at 506. It is significant to mention that in Gross, the antenuptial agreement was upheld in part because the wife signed the agreement against the advice of her attorney, indicating that she knew the agreement was unfavorable to her, but signed it anyway.

Finally, the manner in which the agreement was presented to Dyane Fletcher the day before the wedding militates strongly against its enforceability. The record indicates to my satisfaction that if Dyane had refused to sign the agreement, the wedding would have not gone forward. I emphatically reject the majority's assertion that "because of the small size and informality of the impending wedding" it could more easily have been called off than a large wedding. The majority's establishment of the big wedding-small wedding distinction as a rule of law in Ohio is astonishing and adds nothing to the jurisprudence of this state.

There is no reason for us to "presume the validity of

[the] judgment"; nor do we need to "reweigh the evidence" to conclude that the agreement should not be enforced.  The trial court erred, as a matter of law, by not following the directive of Gross's second syllabus paragraph, which conditions enforceability of such an agreement upon the agreement's being entered into freely without fraud, duress, coercion or overreaching.  All the circumstances surrounding the execution of this agreement, when considered together, clearly reveal that Dyane Fletcher did not freely enter into the agreement.

In summary, antenuptial agreements entered into shortly before a marriage should be unenforceable unless the party forfeiting his or her rights is represented by independent counsel, understands fully the nature and extent of the property involved, and is aware of any and all circumstances in which the document shall apply.  This antenuptial "agreement" should be unenforceable since its terms were unclear, the circumstances evidence that it was not entered into freely without fraud, duress, coercion, or overreaching, and lastly since Kenneth Fletcher attempts to use it to deny Dyane Fletcher her right to share in property acquired by the couple during their marriage.  The judgment of the court of appeals should be reversed.

Douglas and Pfeifer, JJ., concur in the foregoing dissenting opinion.