OPINION
This case is before us on the appeal of George Messer (George) from a judgment awarding a divorce and dividing the property of the parties. George raises the following assignments of error:
 "I. The trial court erred when it entered a distributive award to Appellee of one-half of the Appellant's disability pension income.
 "II. The trial court erred when it held the parties' antenuptial to be invalid.
 "III. The trial court erred in ordering Appellant to immediately pay Appellee her distributive share of the equity in real property; thus ignoring the best interests of the parties' minor child."
After reviewing the record, we find no error in the trial court decision. As a result, the judgment will be affirmed.
 I
The first assignment of error is based on the trial court's division of the marital portion of George's pension. George contends that the trial court erred in awarding Diane Messer (Diane) any part of the pension because the pension was compensation for personal injuries, which is separate property under R.C. 3105.171(A)(6)(a)(vi).
In response, Diane claims that George stipulated to the pension value below and failed to present appropriate evidence to the trial court that would support his claims. Consequently, Diane says that the record supports an award to her of one-half the marital portion of the pension, i.e., one-half of $44,405.40.
R.C. 3105.171(A)(6)(a)(vi) defines "separate property" as: "all real and personal property and any interest in real or personal property that is found by the court to be any of the following: * * * [c]ompensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets." We have previously held that "disability retirement benefits are not marital property unless `they are accepted by the retiree in lieu of retirement pay,'" in which case, they are marital property to the extent that the disability benefit includes the retirement pay value. Elsass v. Elsass
(Dec. 29, 1993), Greene App. Nos. 93-CA-0005, 93-CA-0016, 1993 WL 541610, *5. We have also placed the burden of proof on the party who claims that a disability pension benefit is marital property. Bauser v.Bauser (1997), 118 Ohio App.3d 831, 835. Our decision in the Elsass case has been followed by various other appellate districts. See, e.g., Motterv. Motter, Wyandot App. No. 16-99-14, 2000-Ohio-1714, 2000 WL 1049311, *3.
However, cases citing Elsass have also held that when a party reaches the age to be eligible for retirement, the gross amount "shall be divided and paid equally to the parties as any marital asset." Id. See alsoPotter v. Potter, Wayne App. No. 01CA0033, 2001-Ohio-1770, 2001 WL 1421528, *2 (holding that the trial court abused its discretion by failing to assign any value to a wife's PERS disability benefit). In particular, the court noted in Potter that while the "benefits are not a marital asset, the benefits certainly represent either a retirement benefit or a payment in lieu of old-age retirement pay as of * * * [the wife's] retirement date." Id. Therefore, the court concluded that the benefits should be considered a marital asset to be given a value based upon the benefits accrued as of the date set for valuation of the marital property.
Motter and Potter are consistent with Elass. For example, in Elsass, the parties stipulated that: "appellee's receiving his disability retirement benefits would in no way diminish the amount of any voluntary or old age retirement benefits that he will eventually receive with one-half of that amount going to appellant." 1993 WL 54160, *5. Thus, under Elsass, the spouse was not precluded from obtaining any recovery of pension benefits. However, she was not allowed to tap into the amount currently being received as income replacement.
Similarly, in Criswell v. Criswell (Sept. 29, 2000), Montgomery App. Nos. 18101, 18111, 2000 WL 14333871, the parties were divorced in 1981 or 1991, and the husband had a vested retirement benefit that would entitle him to a monthly pension of $259 per month at age 65 (sometime in the year 2003).[1] At the time of the divorce, the trial court held the pension to be a marital asset and awarded the wife $129.50 from the monthly retirement benefits. The husband was also ordered to contact his wife when payment of retirement benefits began. 2000 WL 1433871, *1.
Subsequently, in 1995, the husband went on permanent disability. In 1998, the wife filed a contempt motion, claiming that the husband had failed to comply with the provision requiring him to pay her part of his pension benefits. Notably, this was before the time the husband had been scheduled to retire (2003). The husband was then held in contempt and was ordered to begin paying $129.50 per month. On appeal, we reversed, finding that the wife did not satisfy her burden. Id. at *2. Specifically, we stated that "there is no evidence in the record that Mr. Criswell's receipt of voluntary, old age retirement benefits, when he reaches retirement age, will be diminished, or otherwise adversely affected, by his present receipt of disability benefits." Id.
According to the record in the present case, George Messer was born in 1942, and began work at General Motors (GM) on November 11, 1966. George and Diane were married May 16, 1987, and George took disability retirement as of November 1, 1992. At the divorce hearing, neither George nor Diane presented a witness to testify about George's pension benefit. However, Diane did submit a written report computing the present value of George's retirement benefits from GM. Based on various formulas and assumptions about the service date, date of marriage, and so on, the pension evaluator (Bosse) found that the present value of the retirement benefit was $213,145.92, and that the marital portion was $44,405.40. Accordingly, the magistrate awarded Diane one-half of $44,405.40.
George did not dispute these figures at the hearing. He did testify that he had been on disability retirement from GM since 1992. However, he also said that when he retired, he received a separation payment of about $25,000, paying him for the injury he had received at work.
After the hearing, George submitted a post-trial memorandum, in which he claimed for the first time that the Bosse evaluation overstated the pension amount because the pension contained both a retirement component and a disability component. Attached to the memorandum was a report from a pension evaluator (Kelley). Kelley discussed in detail the difficultly under Ohio law in calculating the retirement portion of disability pensions. Although Kelley did assign a present value based on the retirement component of George's pension, the references in the report to the money value of the pension were redacted. According to the comments in the memorandum, the values were redacted because of the court's prior ruling that certain information was inadmissible.
On reviewing the record, we saw no specific ruling to this effect. However, such an evidentiary ruling may have occurred before trial, off the record. In this regard, George's attorney commented at the divorce hearing about a discussion he had with the court about a week before the hearing. Specifically, the attorney told the court the week before the hearing that George's pension appraiser had just recently provided a report. George's attorney then asked the court to delay hearing the pension issue. In response, the court apparently outlined conditions under which a delay could occur, i.e., the court said that a sum of money needed to be in the attorney's trust account by the day of the hearing. The record does not clearly reveal the purpose for the money, but it appears to have been for expert witness fees. In any event, the court said that if this condition were not satisfied, Bosse's evaluation would be used.
At the divorce hearing, George's attorney indicated that the money was not in his trust account. As a result, the attorney agreed that under the court's prior ruling, Bosse's pension evaluation would be used. This was not precisely a stipulation to the content of a report (as Diane suggests), but was more like agreement by inaction or default. Nonetheless, Diane was not at fault in this situation, since she did have her own expert report which was not disputed at the hearing.
After receiving the post-trial memorandum, the magistrate issued a decision, finding the pension to be marital property, and also finding the values outlined above. George then filed four specific objections to the decision and one general objection. In the general objection, George claimed the magistrate had erred by failing to consider the issues raised in the post-trial memorandum. He did not specifically discuss these issues, however. Instead, he incorporated the memorandum by reference. George also did not make a specific objection to valuation of the pension, other than claiming that the valuation was based on an improper hire date (November 1, 1966, rather than November 30, 1967).
Ultimately, the trial court rejected the objections and adopted the magistrate's decision. Regarding the general objection, the court noted that it did not specifically raise issues for the court's consideration separately from the other four more specific objections. Consequently, the trial court indicated that it would consider the merits of the objection only in connection with the specific objections.
Civ.R. 53(E)(3)(b) provides that "[o]bjections shall be specific and state with particularity the grounds of objection." The rule further states that "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule."
Although Civ.R. 53 expressly requires specificity, we think the disability issue was adequately raised when it was mentioned in the post-trial memorandum and was then incorporated by reference into the objections that were filed. The purpose of objections is to put the court on notice of a party's particular complaint, at a time when errors can be corrected. This purpose was satisfied in the present case, since the disability issue was brought to the attention of both the magistrate and the trial court.
Nonetheless, the fact that the objection was raised in a manner sufficient to justify assignment of error on appeal does not necessarily mean that the material supporting the objection justifies a different result. Specifically, the lack of detail in the post-trial memorandum (and hence, the objections) did not help the magistrate or the trial court decide the issue. The most the trial court could have done at that point would have been to convene another hearing to allow presentation of pension information. However, that was precisely what the trial court was trying to avoid when it said that the hearing on the pension could be delayed if George deposited the witness fees in his attorney's trust account. George chose not to do that, and chose not to contest the evidence at the hearing. As a result, any error has been waived. In rePieper Children (1993), 85 Ohio App.3d 318, 328.
Furthermore, while we can recognize "plain error," this doctrine is not favored and is reserved in civil cases for "exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson, 79 Ohio St.3d 116,1997-Ohio-401, syllabus. We don't think such a description applies where litigants choose, for their own reasons, not to present evidence that might aid the court, but then later complain that the court did not have appropriate evidence. We also note that by his own admission, George did receive $25,000 in settlement of his disability claim, and $16,000 of this amount was credited to him as a separate asset in calculating the equity in the marital residence. No spousal support was awarded, either, despite the fact that Diane left high school without graduating and had not worked during the marriage. Under the circumstances, the decision to award a portion of the retirement benefits does not seriously affect the basic fairness or integrity of the judicial process.
Based on the foregoing discussion, the first assignment of error is overruled.
 II
In the second assignment of error, George contends that the trial court erred in invalidating the parties' antenuptial agreement. The trial court's decision was based on the nature of the parties' relationship and the lack of disclosure of assets. After reviewing the record, we find no error in the decision.
The Ohio Supreme Court has held that antenuptial agreements are "valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." Gross v. Gross (1984),11 Ohio St.3d 99, paragraph two of the syllabus. Overreaching is "used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other." Id. at 105.
The record in this case is replete with evidence of overreaching. According to the testimony, Diane and George first met when she was a child. George was a family friend. At some point, George's wife, Brenda, became paralyzed from the neck down as the result of a shooting incident (George testified that he was grabbing the gun at the time, and the shooting was accidental). Consequently, when Diane was about 14, she began coming over to help clean and take care of the couple's children. Diane and George then began having a sexual relationship when she was 15 and he was 36. Ultimately, George was given legal custody of Diane, and she moved into the house with George and Brenda. The sexual relationship continued, and resulted in Diane having an abortion when she was only 15. At that time, Diane did not want an abortion. However, George told her that if she did not get an abortion, he would tell people that she had been sleeping with every "Tom, Dick, and Harry."
Eventually, when Diane was 17 or 18, George divorced his wife. George and Diane continued to live together, and finally married in May, 1987, when Diane was 23. In the meantime, Diane had quit her high school education after eleventh grade.
George did not want to get married, as he had just gone through a nasty divorce and had lost everything. On the other hand, Diane wanted very badly to get married. About two months before the marriage, Diane signed an antenuptial agreement waiving: 1) all rights to which she might be entitled as a spouse; 2) all rights in any existing real property or any property acquired during marriage; 3) the right to any personal assets of George, including retirement funds; 4) the right to alimony; and 5) the right to custody of any children born of the marriage. George agreed to waive the right to child support. This agreement was prepared by George's attorney, and Diane was unrepresented by counsel. The agreement was preceded by two other handwritten agreements, in which Diane also promised to relinquish all rights to every article of real or personal property, except her personal belongings, and all rights to custody of any children, if George would marry her.
Although the parties dispute whether Diane read the agreement that was prepared by an attorney, and also dispute where the agreement was signed, those disputes are irrelevant. The parties also disagree about whether Diane and George both believed George was still her legal guardian at the time she signed the agreement. There is some evidence to that effect in the record, including George's deposition testimony. However, George denied this at trial. Nonetheless, in view of the history of the relationship — which was not disputed in any significant detail there was clear evidence of overreaching on George's part.
In Gross, the Ohio Supreme Court stressed that on judicial review of an antenuptial agreement, the agreement "must meet the general tests of fairness as referred to previously, and must be construed within the context that by virtue of their anticipated marital status, the parties are in a fiduciary relationship to one another. The parties must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement." Id. at 108. Obviously, a high degree of fairness did not exist here.
Furthermore, the record also supports the trial court's finding that assets were not disclosed. In this regard, Gross indicates that disclosure is "satisfied either by the exhibiting of the attachment to the antenuptial agreement of a listing of the assets of the parties to the agreement, or alternatively a showing that there had been a full disclosure by other means." Id. at. 105. The agreement in the present case did not refer to any assets, other than a house George owned at the time, nor was any list attached to the agreement. Diane testified that she was not aware of George's other assets, including retirement funds, bank accounts, or vehicles. Similarly, George testified that at the time of the agreement, he owned a house trailer, a whole life policy of insurance through GM, a GM pension, and a vehicle. Admittedly, none of these items was disclosed in the agreement. Thus, the evidence of record supports the trial court's finding that assets were not disclosed.
Notably, the Ohio Supreme Court has said that: "[w]hen an antenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the one claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent." Fletcher v. Fletcher, 68 Ohio St.3d 464, 467,1994-Ohio-434. George clearly did not meet this burden.
In light of the preceding discussion, the second assignment of error is without merit and is overruled.
 III
In the final assignment of error, George contends that the trial court's order requiring him to immediately pay Diane her share in the parties' real property ignores the best interests of their child. At the time of the divorce hearing, the parties had one child, Kevin, who was born on December 12, 1988. The Messers moved to their current residence (a house and about ten and a half acres) when Kevin was in kindergarten. At the hearing, George expressed a desire to keep the house and pass it on to Kevin. He also said he did not know if he would be able to obtain a loan. However, George did testify that he had checked with a bank about a loan and had been told he could borrow money. Nonetheless, George maintained that he did not think he could afford the payments. On the other hand, Diane said she needed her share of the equity, so that she could pay debts, including $3,500 in attorney fees for the divorce, a vehicle, and perhaps some schooling.
The house and land were valued at $80,000, and had an existing mortgage of about $21,389 at the time of the hearing. After crediting George with $17,000 non-marital interest, the magistrate awarded Diane $19,130 as her share of the equity. George was ordered to try to refinance the property for purposes of paying Diane her share. If refinancing could not be obtained within sixty days, the house was to be sold.
To support his argument, George cites R.C. 3105.171(F), which states that:
 "[i]n making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors: (1) The duration of the marriage; (2) The assets and liabilities of the spouses; (3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage; (4) The liquidity of the property to be distributed; (5) The economic desirability of retaining intact an asset or an interest in an asset; (6) The tax consequences of the property division upon the respective awards to be made to each spouse; (7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property; (8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses; (9) Any other factor that the court expressly finds to be relevant and equitable."
The factor George relies on most particularly is R.C. 3105.171((F)(3), which deals with the desirability of awarding the marital home, or a reasonable habitation period in the home, to the party with custody of minor children. Additionally, George relies on R.C. 3105.171(J), which gives courts equitable powers to grant a spouse to use the marital dwelling for a reasonable period of time.
In divorce cases, trial courts have broad discretion to decide what property division may be equitable. Cherry v. Cherry (1981),66 Ohio St.2d 348, paragraph two of the syllabus. We review such decisions for abuse of discretion, which means "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. We are also not free to substitute our judgment for that of trial court. Instead, we are "`guided by a presumption that the findings of the trial court are correct.'" Bauser, 118 Ohio App.3d 831,836.
In this regard, George also cites numerous out-of-state cases as evidence that courts do not abuse their discretion by delaying the sale of a home until a minor child reaches the age of majority. However, the fact that a court may not abuse its discretion by delaying sale does not mean that a court, therefore, does abuse its discretion when it divides property and orders a sale. We have said on numerous occasions that a reduced standard of living for all parties is often a regrettable byproduct of divorce. See, e.g. Easterling v. Easterling (April 13, 2001), Montgomery App. No. 18523, 2001 WL 369734, *3. While this is unfortunate, the situation is not helped when parties spend significant sums of money that they do not have, in order to contest the value of limited assets. For example, the record in this case contains appraisal reports and testimony from two real property appraisers, reports from two other appraisers as to personal property, and reports of pension evaluators. However, the total value of both real and personal assets, exclusive of the pension, is not very high. Further, as we mentioned earlier, Diane has incurred at least $3,500 in attorney fees before this appeal, and one would assume that George's fees are in that range as well.
Unfortunately, the parties' only disposable assets are the house and the land. Under the circumstances of this case, we cannot find that the magistrate and trial court abused their discretion by requiring prompt payment of Diane's share of the house equity. We note that the order did not require George to leave the house; it simply said that if the house could not be refinanced, it would have to be sold. This is a scenario that occurs frequently in divorce cases. If the only source of assets is the marital home, courts do not act arbitrarily or unreasonably when they require the home to be sold. A different rule might apply in unusual circumstances, but we see no evidence of that here. Compare Bauser,118 Ohio App.3d at 836 (indicating that court should not leave marital asset undivided absent evidence of particularized need to retain joint ownership). In Bauser, we also found that a reasonable term for a spouse to remain in the martial premises under R.C. 3105.171(J), is one that is "short-term and temporary, and granted upon a showing of particularized need." Id. at 836. The reasons advanced by George in this case are no different than what any custodial parent might say about a desire to remain in the marital home. Although we are not unsympathetic, we cannot say that the court abused its discretion in requiring Diane to be paid for her share of the equity. Moreover, as we said, the record does not even indicate that George will have to leave the premises. To the contrary, George testified that the bank said he could borrow money. It was George's own opinion (not established by the evidence) that he did not think he could make the payments.
Based on the preceding discussion, we find no abuse of discretion in the trial court's order concerning payment of Diane's equity in the marital premises. Accordingly, the third assignment of error is without merit and is overruled.
Since all three assignments of error have been overruled, the judgment of the trial court is affirmed.
WOLFF, P.J., and FAIN, J., concur.
[1] The opinion in Criswell uses both 1981 and 1991 as dates for the divorce, but the actual date is not critical to the decision. See 2000 WL 1433871, *1.