[Cite as *Fordeley v. Fordeley*, 2020-Ohio-5380.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| CHRISTINA FORDELEY, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-T-0006** |
| MARK FORDELEY, et al., | : | |
| Defendants-Appellants. | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Domestic Relations Division, Case No. 2012 DR 00330.

Judgment: Reversed and remanded.

*Matthew C. Giannini*, 1040 South Commons Place, Suite 200, Youngstown, Ohio 44514 and *Louis E. Katz,* 70 West McKinley Way, Suite 16, Poland, Ohio 44514 (For Plaintiff-Appellee).

*Robert L. Root, III,* 175 Franklin Street, S.E., Warren, Ohio 44481 (For Defendants-Appellants).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Mark Fordeley, appeals the final divorce decree. He challenges various aspects of the order, including the conclusion that the parties' prenuptial agreement is not enforceable. We reverse and remand for further proceedings.

{¶2} Appellant met appellee, Christina Fordeley, in early 1993 when she was a senior in high school. In contrast, appellant was thirty years old and had been operating his own vehicle cleaning business, Buff-n-Stuff, for more than a decade. He also owned

a majority interest in a small used car lot that he operated with his father and multiple tracts of land throughout Trumbull County, including the Buff-n-Stuff property.

{¶3} After appellee's graduation from high school, the parties began dating, and she began working for appellant at his two businesses. After a few months, she became involved in maintaining the books for his businesses.

{¶4} Within a few months after they started dating, the parties became engaged, but appellant consistently told appellee that he would not marry her unless she signed a prenuptial agreement. In December 1993, appellee became pregnant. Four months later, the parties went to Las Vegas where they planned to be married. However, the ceremony did not proceed because appellant was unable to locate an attorney to draft a valid prenuptial agreement.

{¶5} In July 1994, appellant hired a local attorney to write a prenuptial agreement. Attached to the prenuptial agreement were two schedules of assets, one for each party. Appellant's schedule listed forty-two items of separate property, with a total value of $438,300; however, his schedule did not include values for his businesses. Appellee's schedule included four items of separate property, totaling $13,250.

{¶6} On July 27, 1994, appellant drove appellee to his attorney's office to pick up the prenuptial agreement that the parties eventually executed. Appellee was eight months pregnant and had never seen the agreement. After retrieving the agreement, appellant drove appellee to a second attorney's office. According to appellee, she did not make the appointment to see the second attorney and did not pay his fee. Before she went into the second attorney's office alone, appellant again told her that he would not marry her unless she signed the prenuptial agreement.

2

{¶7} After reading the entire agreement together, the second attorney told appellee that the terms were not favorable to her and advised her not to sign it. Despite this, appellee signed the agreement. She explained that she signed it because appellant told her to sign it; she did not want her child to be illegitimate; and she did not want to bring shame upon her family. The second attorney then prepared a written waiver stating that he explained some of his concerns about the terms and advised her to give it careful consideration before executing it. The waiver further provides that appellee understood she would not receive any separate compensation for work she performed for appellant's businesses during their marriage. Appellee signed the waiver.

{¶8} When appellee's appointment with the second attorney concluded, appellant returned to his attorney's office and executed the prenuptial agreement. Two days later, the parties married. On August 23, 1994, their first child was born. During their twenty-year marriage, the parties had six children.

{¶9} Through the years, the parties purchased multiple tracts of land in both of their names, including the marital residence. However, the funds used to buy the tracts were supplied solely by appellant. In addition, he purchased other tracts in his name. Moreover, at some point, he formed a third business, Fordeley Rentals, LLC. This entity also owns multiple tracts of land and received income through rent on some of the property.

{¶10} Appellee filed for divorce in August 2012. Appellant subsequently moved the trial court to declare the prenuptial agreement enforceable, and appellee moved to have the agreement deemed unenforceable.

{¶11} The trial court held a two-day hearing regarding enforceability and ruled that

the agreement was unenforceable for two reasons: (1) appellee signed the agreement while under duress; and (2) appellant engaged in coercion and overreaching.

{¶12} Thereafter, trial was held on thirteen separate days throughout 2017. Both sides presented expert testimony as to the value of certain assets, including the businesses and some tracts of property. In distributing the marital assets, the court awarded appellant all the businesses, including Buff-n-Stuff. It awarded appellee various properties valued nearly equal to the assets awarded to appellant finding that she would be able to generate sufficient income from the properties distributed to her. No spousal support was awarded.

{¶13} Appellant appeals assigning the following as error:

{¶14} "[1.] The trial court committed prejudicial error and abused its discretion in determining that the parties' prenuptial agreement is invalid and unenforceable as a result of coercion by appellant, duress of appellee, and overreaching by appellant and that appellee entered into the agreement as a result of appellant conditioning the marriage on her agreement to sign the contract, which created a coercive atmosphere and one in which appellee was under duress.

{¶15} "[2.] The trial court committed prejudicial error and abused its discretion in awarding appellee one-half of appellant's premarital businesses and evaluating them in excess of their fair market value.

{¶16} "[3.] The trial court committed prejudicial error and abused its discretion in adopting a methodology to evaluate the Buff-n-Stuff business, solely on net profits, at a value of $125,713, without making an adjustment for the salary of the sole proprietor and considering the rent and equipment required to run the business.

4

{¶17} "[4.] The trial court committed prejudicial error and abused its discretion in failing to recognize and award appellant's father equitable ownership of six automobiles titled in the name of Wheelz Gone Wild, LLC.

{¶18} "[5.] The trial court committed prejudicial error and abused its discretion in the divisions of parcels of real estate between the parties.

{¶19} "[6.] The trial court erred and abused its discretion in failing to address and adjust the marital division of property to require appellee to contribute one-half of the joint marital debt incurred and paid by appellant during the pendency of the divorce proceedings and also after the date of the de facto termination of the marriage set by the trial court."

{¶20} Under his first assignment, appellant challenges the trial court's ruling that the parties' prenuptial agreement is unenforceable based on duress, coercion, and overreaching.

{¶21} "It is well settled in Ohio that public policy allows the enforcement of prenuptial agreements. *Gross v. Gross* (1984), 11 Ohio St.3d 99, 464 N.E.2d 500, paragraph one of the syllabus. Modern trends in marriage and divorce, and changing social attitudes, compelled the *Gross* court to conclude that these types of agreements tend to promote marriage, rather than encourage divorce. Id. at 105, 464 N.E.2d 500." *Vlad v. Vlad*, 11th Dist. Trumbull No. 2003-T-0126, 2005-Ohio-2080, ¶ 50.

{¶22} Prenuptial agreements "'are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce

5

or profiteering by divorce.'" (citations omitted.) *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 466, 628 N.E.2d 1343 (1994).

{¶23} The trial court based its unenforceability ruling upon its finding of duress, coercion, and overreaching. Regarding the first prong, the party contesting enforcement has the burden to establish fraud, duress, coercion, or overreaching. *Id.* at ¶ 15, citing *Gross*, 11 Ohio St.3d at paragraph two of the syllabus.

{¶24} In considering coercion and overreaching in general, the outcome of the analysis often turns on whether the challenging party had an opportunity to meet with counsel prior to execution. *Fletcher*, 68 Ohio St.3d at 470. "[A]ssistance of counsel may in some cases be necessary for a fully informed and considered decision to sign. The meaningfulness of the opportunity of the nonproponent party to seek counsel before executing an antenuptial agreement is, therefore, a significant element of the *Gross* test to determine whether coercion or overreaching occurred." *Id.*

{¶25} There is no dispute that at the conclusion of appellee's meeting with the second attorney that she signed a written waiver stating that they reviewed the prenuptial agreement together and that she fully understood its terms; that appellee's attorney told her of specific concerns he had; that she should carefully consider those concerns prior to making her final decision; and that she was executing the agreement despite her attorney's advisement that it was not in her best interest.

{¶26} To this extent, appellee was afforded a meaningful opportunity to meet with counsel.

{¶27} For purposes of deciding whether a prenuptial agreement is enforceable, the terms duress and coercion are given their generally accepted meanings. *Vlad*, 2005-

6

Ohio-2080, at ¶ 54, citing *Gross*, 11 Ohio St.3d at 105, 464 N.E.2d 500. "Duress is defined as '[a] condition where one is induced by wrongful act or threat of another to make a contract under circumstances which deprives [her] of exercise of [her] free will.' [Black's Law Dictionary (5 Ed.1979)] at 452. Coercion is defined as 'where one party is constrained by subjugation to [an]other to do what his free will would refuse.' *Id.* at 234." *Baumgartner v. Baumgartner*, 6th Dist. Lucas No. L-88-032, 1989 WL 80947, *10 (July 21, 1989).

{¶28} The trial court's duress and coercion findings are based on appellant's refusal to marry absent a prenuptial agreement and appellee's late-term pregnancy. If conditioning marriage on a prenuptial agreement constitutes duress, then almost all premarital agreements would be unenforceable. *Baumgartner*, at *11. An ultimatum does not constitute duress and render a prenuptial agreement unenforceable. *Mallen v. Mallen*, 280 Ga. 43, 45, 622 S.E.2d 812 (2005).

{¶29} Moreover, appellee was not rushed to make a quick decision without having a full opportunity to consider her options. Appellant told her all along that he would not marry her without a prenuptial agreement, and appellee's pregnancy does not constitute duress.

{¶30} The trial court further found that appellant overreached explaining that while appellant had been operating his own businesses for several years, appellee was a recent high school graduate. Overreaching occurs when "one party by artifice or cunning, or by [exploiting a] significant disparity [in] understanding the nature of the transaction, [seeks] to outwit or cheat the other." *Gross*, 11 Ohio St.3d at 105, 464 N.E.2d 500.

{¶31} However, the terms of the agreement were fully disclosed, and appellee

7

reviewed them with her attorney. Appellee's attorney informed her that the terms are not in her favor and advised her not to sign. Appellant did not overreach.

{¶32} In reviewing a trial court's ruling as to the enforceability of a prenuptial or antenuptial agreement, an appellate court cannot reweigh the evidence, but instead must uphold the trial court's factual findings when they are supported by competent evidence. *Fletcher*, 68 Ohio St.3d at 468. Here, the facts cited by the trial court are insufficient to establish duress, coercion, or overreaching.

{¶33} Thus, the first assignment has merit. The trial court's decision is reversed and remanded. The other aspects of the trial court's decision not challenged on appeal, including its determination that there was no waiver of spousal support and that the parties' change in circumstances rendered the spousal support provision unconscionable, remain unaffected by our opinion.

{¶34} On remand, the trial court shall conduct further proceedings including, but not limited to, considering and ruling on appellee's other arguments regarding the validity of the prenuptial agreement, and thereafter, distributing the parties' assets and liabilities accordingly, and awarding spousal support, if any.


TIMOTHY P. CANNON, P.J., concurs,

MARY JANE TRAPP, J., dissents with a Dissenting Opinion

8

_____

MARY JANE TRAPP, J., dissents with a Dissenting Opinion.

{¶35} I respectfully dissent because my review of the evidence below reveals Mr. Fordeley failed to meet his initial burden to show that Mrs. Fordeley entered into the agreement with the benefit of full knowledge or disclosure of Mr. Fordeley's assets. Further, there was competent and credible evidence to sustain the trial court's conclusions that the agreement was a product of duress and overreach sufficient to invalidate the agreement, despite the fact that Mrs. Fordeley had known for some time that a marriage would not take place unless she signed an antenuptial agreement and despite her written waiver acknowledging that an attorney had advised her prior to execution that the agreement may not be in her best interest.

{¶36} The concepts we now employ in reviewing an antenuptial agreement in the divorce context grew out of those in the probate context, succinctly set out in the syllabus of *Juhasz v. Juhasz*, 134 Ohio St. 257 (1938):

{¶37} "1. An agreement to marry gives rise to a confidential relation between the contracting parties.

{¶38} "2. An antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the wife is fair and reasonable under all the surrounding facts and circumstances.

{¶39} "3. When the amount provided for the wife in an antenuptial contract entered into during the existence of the confidential relation arising from an engagement is wholly disproportionate to the property of the prospective husband in the light of all surrounding circumstances and to the amount she would take under the law, the burden is on those

9

claiming the validity of the contract to show that before it was entered into he made full disclosure to her of the nature, extent and value of his property or that she then had full knowledge thereof without such disclosure.

{¶40} "4. Although the provision made for the intended wife in an antenuptial contract is wholly disproportionate, she will be bound by voluntarily entering into the contract after full disclosure or with full knowledge." *Id.* at paragraphs one through four of the syllabus.

{¶41} The Supreme Court of Ohio declared that the burden shifting set out in *Juhasz* must also apply in the divorce context because of the fiduciary relationship of the parties and because antenuptial agreements "negate the statutorily defined presumptive rights of a spouse to an equitable distribution of marital assets upon divorce. R.C. 3105.171. Thus, paragraph three of the syllabus in *Juhasz* remains good law and applies to prenuptial agreements made in contemplation of divorce. When an antenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the one claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent. The burden of proving fraud, duress, coercion or overreaching, however, remains with the party challenging the agreement." *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 467 (1994).

{¶42} "Although antenuptial agreements are not *per se* invalid, they must meet certain minimum standards of good faith and fair dealing. If the agreement is fair and reasonable under the circumstances, it will be deemed enforceable. * * * The prospective spouse must be fully and accurately apprised of the nature, value, and extent of the

10

property affected by the agreement, and must enter into it voluntarily." (Citations omitted.) *Zimmie v. Zimmie*, 11 Ohio St.3d 94, 98 (1984).

{¶43} The touchstone for judicial review of an antenuptial agreement is the decision in *Gross v. Gross*, 11 Ohio St.3d 99 (1984), which established a three-part fairness test. If the evidence shows the agreement was entered into "freely without fraud, duress, coercion or overreaching;" after "full disclosure, or full knowledge, and understanding, of the nature, value and extent of the prospective spouse's property;" and the agreement does not "promote or encourage divorce or profiteering by divorce," the agreement will be enforced. *Id.* at 105.

{¶44} If those "general tests" are met, the *Gross* court added that the agreement must be construed by the reviewing court "within the context that by virtue of their anticipated marital status, the parties are in a fiduciary relationship to one another. The parties must act in good faith, with a *high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement.*" (Emphasis added.) *Id*. at 108. Thus, it appears the court created a higher standard of fairness and disclosure than the "minimum standard of good faith and fair dealing" standard described in *Zimmie, supra*.

{¶45} There is no dispute that the antenuptial agreement provides disproportionately less than Mrs. Fordeley would have received under an equitable distribution. Specifically, the parties' disclosures made via the schedule of assets attached to the agreement list all items attributed to Mr. Fordeley with individual item values totaling $438,000 (compared to Mrs. Fordeley's individually valued assets totaling

11

$13,250), but Mr. Fordeley's business interests disclosed only by name, "Buff-N-Stuff" and "Fordeley's Finest Pre-Owned Auto," had no values listed.

{¶46} Additionally, the trial court found that Mr. Fordeley admitted that he owns or has an interest in Fordeley Rentals LLC that was not listed at all. The court found that the Fordeley Rentals LLC entity owns real property valued by the Trumbull County Auditor at over $600,000 and receives monthly payments under a land contract of $1,000. Mr. Fordeley also admitted the vacant lot at 575 Franklin valued by the auditor at $5,100 was also not listed on the schedules.

{¶47} "[G]ood faith requires full disclosure not only as to the nature and amount of the intended husband's property but also of its value." *Juhasz* at 267.

{¶48} And regarding the undisclosed asset, Fordeley Rentals LLC, this is case is distinguishable from that of *Millstein v. Millstein,* 8th Dist. Cuyahoga Nos. 79617, 79754, 80184, 80185, 80186, 80187, 80188, & 80963, 2002-Ohio-4783, cited in support by Mr. Fordeley because the value of the undisclosed asset is significant when compared to the total value of his assets.

{¶49} Thus, while the trial court did not make a specific conclusion of law regarding Mr. Fordeley's full disclosure or Mrs. Fordeley's full knowledge and understanding of the nature, value, and extent of Mr. Fordeley's property, from the findings of fact by the trial court it cannot be said that Mr. Fordeley met his initial burden to show that Mrs. Fordeley entered into the agreement with the benefit of full knowledge or disclosure of his assets, inasmuch as substantial assets were not disclosed nor were the values of two identified businesses disclosed.

{¶50} Even if we assume arguendo Mr. Fordeley met his initial burden, I find no error in the trial court's determination that the agreement is invalid due to duress and overreaching.

{¶51} It is critical to note that Mrs. Fordeley never saw the agreement before Mr. Fordeley took her to meet with the attorney whom he picked to review and advise her. Mr. Fordeley drove her to his attorney's office to pick up the document. He handed it to her when they were driving just around the corner to the other attorney's office for the appointment Mr. Fordeley scheduled.

{¶52} Mrs. Fordeley did not recall how long she was with her attorney, but Mr. Fordeley testified she was with the attorney for "30 to 45 minutes," while he waited in the car.

{¶53} While it is true that she met with the attorney and he advised her that day the agreement "may" not in her best interest and prepared a written waiver to that effect, the waiver did not specifically advise her that she was entitled to full disclosure of the value of all assets. So, within the space of less than an hour of time, Mrs. Fordeley, a nineteen-year old Catholic girl barely a year out of high school, who was over eight months pregnant and whose parents did not approve of her thirty-year old boyfriend, was handed for the first time a nine-page agreement, was driven to an attorney's office, met with the attorney, purportedly read the document and also had it explained to her by the attorney, listened to an advisement by the attorney, waited for his secretary to prepare a waiver, signed the waiver and the agreement, and returned to the car.

{¶54} She testified she does not recall being given her own copy of either the signed agreement or the signed waiver when she left the attorney's office. Mr. Fordeley

13

testified he returned the original signed documents that day to his attorney's office, where he signed the agreement.

{¶55} They married two days after the document was signed. She admittedly signed the agreement because she knew she had no choice but to sign an agreement so they could marry before the child was born.

{¶56} The trial court also found that "the fact that Plaintiff's supposed counsel met with Mr. Fordeley and his counsel [along with the attorney who drafted the agreement for Mr. Fordeley] to prepare for the hearing on the validity of the antenuptial agreement causes this Court to be even more concerned about the representation Plaintiff received."

{¶57} In sum, the trial court found the independent review by counsel was not "meaningful." I agree.

{¶58} "[F]or overreaching, there are two considerations. The first is whether there was a meaningful opportunity to consult with counsel. The second is if the agreement was presented shortly before the ceremony, would the postponement of the wedding cause a significant hardship, embarrassment or emotional stress." *In re Estate of Gates v. Gates*, 7th Dist. Columbiana No. 06 CO 60, 2007-Ohio-5040, ¶40.

{¶59} The majority correctly notes Mrs. Fordeley knew for some time that Mr. Fordeley would not marry her unless and until an antenuptial agreement was in place, but I disagree with the majority's observation that she was "not rushed to make a quick decision without having a full opportunity to consider her options." It would be a different situation where she had had the agreement for weeks or months. Here, she had the agreement for literally minutes before she met with an attorney not of her own choosing,

14

and when Mr. Fordeley knew she was in her eighth month of pregnancy and it is was critical to her that she marry before she gave birth.

{¶60}  The majority notes that pregnancy does not constitute duress, but it is not the fact that she was pregnant, alone, but the combination of many factors supported by the evidence that created the duress.  In regard to timing, one can always postpone a wedding, but one cannot postpone the birth of a child.

{¶61}  When these facts are considered along with other trial court findings regarding the disparity in age and business experience, and the fact that Mrs. Fordeley was only a year out of high school at the time the agreement was presented and signed, I find the trial court's determination that there was duress and overreach to be supported by the evidence.

{¶62}  Although the trial court did not specifically analyze the second *Gross* factor – "if there was full disclosure, or full knowledge, and understanding, of the nature, value and extent of the prospective spouse's property," there can be no doubt from the plain reading of the agreement and the admission of Mr. Fordeley that he did not disclose the existence of another business, that there is sufficient evidence that Mr. Fordeley failed to meet the second requirement of *Gross.  See id.* at 105.

{¶63}  We review a trial court's decision regarding the validity of a prenuptial agreement under an abuse of discretion standard.  *Bisker v. Bisker,* 69 Ohio St.3d 608, 609-10 (1994).  *See also Zawahiri v. Alwattar,* 10th Dist. Franklin No. 07AP-925, 2008-Ohio-3473, ¶21; *Gates* at ¶13.  The term "abuse of discretion" is one of art, "connoting judgment exercised by a court, which does not comport with reason or the record."  *In re K.R.,* 11th Dist. Trumbull No. 2010-T-0050, 2011-Ohio-1454, ¶29, citing *Gaul v. Gaul,*

15

11th Dist. Ashtabula No. 2009-A-0011, 2010-Ohio-2156, ¶24, citing *State v. Ferranto*, 112 Ohio St. 667, 676-78 (1925). Stated differently, an abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black Law's Dictionary* 11 (8th Ed.Rev.2004). Further, determining the validity of a prenuptial agreement "is a question of fact best left to the trial court." *Bisker* at 610.

{¶64} An appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court. *Myers v. Garson*, 66 Ohio St.3d 610, 616 (1993). Thus, we will not reweigh the evidence introduced in a trial court; rather, we will uphold the findings of the trial court when the record contains some competent evidence to sustain the trial court's conclusions. *Ross v. Ross*, 64 Ohio St.2d 203, 204 (1980). In addition, we will indulge all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law. *In re Sublett*, 169 Ohio St. 19, 20 (1959).

{¶65} The trial court did not abuse its discretion by determining that the agreement was unenforceable; thus, I would affirm that decision and proceed to consider the remaining assignments of error.