DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Wood County Court of Common Pleas, Domestic Relations Division, in a final divorce decree which designated certain property as marital and did not credit appellant/cross-appellee for payment of temporary spousal support and other marital debts from marital funds. Because we conclude that the trial court erred in some of its determinations, we affirm in part and reverse in part.
 {¶ 2} Appellant/cross-appellee, John Forbis, and appellee/cross-appellant, Kathleen Forbis, were married on October 20, 1967. Kathleen filed for divorce on July 9, 2001; John answered and counterclaimed. The parties had one child, emancipated at the time of the divorce.
 {¶ 3} Kathleen also filed a motion for temporary spousal support and other requests for payment of marital bills. The magistrate's decision was filed on September 21, 2001; the trial court ruled on the parties' objections on November 30, 2001. Over John's objections, the trial court granted Kathleen $10,000 per month in temporary spousal support, beginning on July 9, 2001. John was also ordered to pay $4,700 per month for the two mortgages on the marital residence, as well as invoices in excess of $15,000 for landscaping at the marital residence. Each party was also to receive a distribution of $100,000, to be used at the parties' discretion, from a marital trust account funded by the proceeds of the Kroy sale to Nortek.
 {¶ 4} Prior to the court's ruling on the parties' objections, Kathleen filed a "motion for contempt" on October 3, 2001. She claimed that John had not paid temporary support as ordered and had failed to distribute her $100,000 portion of the marital trust fund. In January 2002, at the show cause hearing before the magistrate, John acknowledged being approximately $33,000 behind on monthly spousal support payments, but denied that it was willful. John provided documentation that his monthly net pay was between $12,000 and $12,800 and that, due to low production at Kroy, he would not be receiving a 2001 bonus ($137,000 for 2000), which effectively reduced his yearly gross income by one-third. He also stated that he had made partial spousal support payments because he paid household bills which Kathleen had been ordered to pay, but presented to him. John further stated that he had utilized marital trust account funds to pay some of these bills, including spousal support, because the $10,000 per month order was impossible for him to pay and still cover his own living expenses.
 {¶ 5} Evidence was presented that, in addition to making $5,000 per month spousal support payments to Kathleen, John had also paid over $33,000 for the following on her behalf: $7,000 for a refrigerator for the marital home; $5,000 for charges and fees at Belmont Country Club; $900 for a pet sitting service used while Kathleen was on vacation; $666 monthly payment to a Citibank credit card on which Kathleen had taken an $11,000 cash advance just prior to filing the divorce; $15,000 to a tree service company; $3,700 for annual insurance premium on John but owned by Kathleen; and doctor bills and other bills totaling approximately $1,000.
 {¶ 6} The magistrate found John to be in contempt, but credited him with $19,000 paid for certain bills, towards the arrearage. John was also ordered to return the $15,000 paid for the landscaping bill to the trust fund. John filed objections to the magistrate's decision, but the trial court overruled those objections, stating that the objections had been filed one day too late. The parties continued to file additional pleadings, including Kathleen's second motion for contempt in June 2002, followed by John's motion to modify the spousal support in August 2002.
 {¶ 7} On November 7, 2002, the magistrate conducted a "final" hearing to resolve issues regarding property division and the following facts were presented. John's career required the couple to relocate many times over the years, living in various parts of the United States. Kathleen was not employed outside the home. In 1991, the couple moved to Perrysburg, Ohio. In 1996, however, appellant accepted a position as president and CEO of Kroy Industries ("Kroy"), requiring him to move to Lincoln, Nebraska. From 1996 to 2001, Kathleen remained in Perrysburg with John often flying back on weekends.
 {¶ 8} In 1999, Kroy was purchased by Nortek, but continued to be operated under the name of Kroy Building Products. John received approximately $2.5 million from the proceeds of the sale and also executed an Incentive Compensation Agreement and Noncompetition Agreement with Nortek. The incentive agreement provided that John was to be additionally compensated with a lump sum cash bonus of $1 million if he remained employed at Kroy until September 9, 2003. If John left his employment with Kroy after September 9, 2001, the Noncompetition Agreement barred him from employment in the vinyl siding, fencing, and railing business for three years following the end of his employment with Kroy.
 {¶ 9} The parties stipulated to the values of the three residences and vehicles; marital debt, including: payments of $4,700 per month for two mortgages on the marital residence; credit card/line debts totaling approximately $135,000; the value and distribution from the sale of vacation property in Washington; the values of various investment accounts and life insurance policies; values of John's three pension plans; the values of the household properties distributed to each party; and the amount of marital funds spent by John for non-marital expenses, such as vacations and a vehicle. The parties disagreed on whether an incentive bonus payment of $1,000,000 to be paid to John in September 2003, was marital property.
 {¶ 10} Over one year later, the magistrate issued a decision on November 18, 2003. Among other determinations, the magistrate ruled that the bonus payment was a substitute for compensation to John in consideration of a separate three year non-competition agreement. Among the determinations, the magistrate reduced the bonus to $190,000 before crediting it to John and awarded Kathleen a lump sum of $262,500 to equalize the division of marital assets. The magistrate also denied Kathleen's request for attorney fees. Both parties filed various objections to this decision.
 {¶ 11} On June 21, 2004, the court issued its decision regarding the objections and ruled as follows: 1) the $1,000,000 incentive payment was a marital asset subject to after-tax division; 2) John was ordered to pay Kathleen $7,500 per month indefinite spousal support, effective as of August 1, 2003, until her death, remarriage, or co-habitation with a non-relative male; 3) Kathleen was awarded one of the two $1 million dollar term life insurance policies on John's life, with John to pay the premium as additional spousal support; 4) Kathleen was awarded a lump sum of $466,385 to equalize the division of assets; and 5) Kathleen was awarded partial payment of her attorney's fees in the amount of $32,500, one-half of the fees billed. The trial court valued and distributed the assets as follows:

 Wife Husband
Seventh Street Residence $285,000 Nebraska Residence $415,000
Household/personalty 244,000 Household/personalty 28,000
Belmont Country Club certif. 2,500 Nebraska household 51,800
1998 Mercedes (net w/loan) 0 2002 BMW (leased) 0
Merrill Lynch (joint account) 7,100 1995 BMW 15,000
Merrill Lynch Account 40,600 1997 Windstar 11,000
Kroy Pension (1/2) 35,600 Kroy pension (1/2)
 35,600 Mass. Mutual Ins. Pol. 11,500
 Marital funds — girlfriend 26,800
 2001 Income Tax Refund 1,600
 Ampersand Account 126,000
 Nortek Stock Options 127,500
 Suntrust Acct. (imputed) 167,771
 Incentive Bonus 530,000
 _______ _______
Subtotals 614,800 1,547,571
Cash adjustment 466,385 (466,385)
 _______ _________
Net Totals $1,081,185 $1,081,185
 {¶ 12} Appellant, John, now appeals that judgment, arguing the following four assignments of error:
 {¶ 13} "First Assignment of Error
 {¶ 14} "The trial court erred in its determination that, as a matter of law, the defendant's incentive compensation agreement and noncompetition agreement comprised an asset that was entirely marital, a finding that was wholly contrary to the undisputed evidence and to the decision reached by the magistrate."
 {¶ 15} "Second Assignment of Error
 {¶ 16} "The trial court erred in establishing the $10,000 per month interim award of spousal support and compounded the error by holding as a matter of law that appellant could not utilize marital assets for the payment of support obligations for which he did not have adequate income."
 {¶ 17} "Third Assignment of Error
 {¶ 18} "The trial court erred when it set spousal support at $7,500 per month, plus an additional $3,735 per annum for the payment of appellee's Minnesota Mutual term life insurance coverage on appellant's life; further, the trial court erred as a matter of law when it established August 1, 2003 as the beginning date of the permanent spousal support order."
 {¶ 19} "Fourth Assignment of Error
 {¶ 20} "The trial court erred in its award of $32,500 of attorney fees to appellee, particularly given the fact that the court based its award in large measure on a contempt proceeding that occurred after the date of trial and for which attorney fees were specifically awarded."
 {¶ 21} Appellee, Kathleen, cross-appeals, arguing the following sole assignment of error:
 {¶ 22} "A trial court abuses its discretion in failing to award, pursuant to R.C. 3105.18(H), the full, reasonable attorney's fees requested by a wife with essentially no employment history or earning ability, from an ex-spouse whose annual gross adjusted income regularly reaches into the six and seven figures."
 I. {¶ 23} In his first assignment of error, John argues that the trial court erred in determining that the incentive agreement award constituted a marital asset. Specifically, John claims that the court erred in rejecting the magistrate's calculations which designated only $190,000 of the $1,000,000 award as marital.
 {¶ 24} On appeal, the overall appropriateness of a trial court's property division in divorce proceedings is generally reviewed under an abuse of discretion standard. See Cherry v. Cherry (1981),66 Ohio St.2d 348. Appellate review of a trial court's classification of property as marital or separate, however, is based on whether the determination is supported by the manifest weight of the evidence. Jamesv. James (1995), 101 Ohio App.3d 668, 684. The findings of a trial court will be upheld where the record contains some competent, credible evidence to support those findings. Fletcher v. Fletcher (1994),68 Ohio St.3d 464, 468.
 {¶ 25} Pursuant to Civ.R. 53(E)(4)(b), upon the filing of objections, a trial court "may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter." In a divorce proceeding, property acquired during the marriage and held by a spouse is presumed to be marital property. R.C. 3105.171(A)(3)(a)(i). "During the marriage" generally means "the period of time from the date of the marriage through the date of the final hearing in and action for divorce." R.C.3105.171(A)(2). The party to a divorce action seeking to establish that an asset or portion of an asset is separate property, rather than marital property, has the burden of proof by a preponderance of evidence. Zeefev. Zeefe (1998), 125 Ohio App.3d 600, 614; Peck v. Peck (1994),96 Ohio App.3d 731, 734.
 {¶ 26} In this case, the incentive agreement was incident to the sale of Kroy which occurred during the marriage. After reviewing the record, we agree with the trial court's analysis that the $1,000,000 was a bonus payment offered to entice John to continue to provide his expertise and guidance to Kroy for several more years, and was not intended as a substitute for future earnings during the three year non-competition period should he leave Kroy. Had John left Kroy prior to September 9, 2003, he would not have received the bonus, but would have still been bound by the three-year non-competition agreement. The receipt of the bonus was solely within John's control, dependent only upon his decision or ability to stay with the company, which he did.
 {¶ 27} Nonetheless, appellant suggests that since the incentive bonus had not been paid at the time of the final hearing, it cannot be considered a marital asset. We disagree. The incentive agreement created an expectancy interest, much like an unvested pension plan, that if John performed certain services, he would receive compensation.
 {¶ 28} An unvested pension plan has value and may be considered a marital asset under certain circumstances. Clymer v. Clymer (Sept. 10, 1991), 10th Dist. No. 91AP4-38; Lemon v. Lemon (1988),42 Ohio App.3d 142, 144. "As with all valuable assets accumulated during a marriage by either spouse, these benefits may be found to be marital property by a trial court and, if so, must be considered in the equitable division of marital assets." Haller v. Haller (Mar. 18, 1996), 12th Dist. No. CA95-06-063. See, also, Lemon, supra, at 144.
 {¶ 29} Although John had no absolute right of collection at the time of the final hearing, he certainly retained an expectation that he would be paid the $1,000,000 if he were to continue the employment which began in 1999. Kathleen's expectation interest was no less than John's. Therefore, the unpaid, unmatured incentive bonus was a valuable asset which was properly deemed to be marital.
 {¶ 30} Moreover, by the time the magistrate's decision was issued, one year after the hearing, the bonus payment was no longer speculative, but had, in fact, been paid. Likewise, when the trial court later considered the parties' objections, the Perrysburg marital home had been sold. The inordinately long lapse in time between the final hearing and the magistrate's decision required the trial court to make additional factual findings and modifications to the magistrate's decision. The trial court properly considered events which had occurred in the interim, such as the sale of the marital home and the payment of the bonus. Consequently, just as the trial court properly modified the magistrate's decision to include the division of the proceeds from the completed sale of the marital home, it also recalculated and divided the proceeds from the incentive agreement bonus. After reviewing the calculations by the magistrate and the rationale used by the trial court, we conclude that the trial court's inclusion of the entire bonus, reduced by almost one-half, in consideration of the tax consequences, more accurately designates the bonus as compensation for staying at Kroy, rather than as a substitute for income during the non-competition period. Therefore, we conclude that the trial court's classification and calculation of the marital value of the incentive bonus was supported by competent, credible evidence.
 {¶ 31} Accordingly, appellant's first assignment of error is not well-taken.
 II. {¶ 32} In his second assignment of error, John argues that the trial court erred in awarding Kathleen $10,000 per month in temporary spousal support and in denying him the use of marital funds to pay the support or expenses of the parties.
 {¶ 33} An award of spousal support generally lies within the trial court's sound discretion. See Cherry v. Cherry (1981), 66 Ohio St.2d 348;Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 218. Appellate review of a court's decision to grant or deny requested spousal support is limited to a determination of whether the court abused its discretion. Bowen v.Bowen (1999), 132 Ohio App.3d 616, 626. Absent an abuse of that discretion, a reviewing court may not substitute its judgment for that of the trial court. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 131. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude in reaching its judgment was unreasonable, arbitrary or unconscionable. Blakemore, supra, at 219.
 {¶ 34} Nevertheless, a trial court's broad discretion in awarding spousal support is controlled by the R.C. 3105.18(C)(1) factors. Carmonyv. Carmony, 6th Dist. No. L-021-354, 2004-Ohio-1035, at ¶ 10. "When considering an award of spousal support, a court should consider all fourteen factors listed in R.C. § 3105.18(C), and award only an amount which is appropriate and reasonable, not an amount based [only] upon need." Schultz v. Schultz (1996), 110 Ohio App.3d 715, 724. Although "the concept of need is necessarily encompassed in an inquiry upon appropriateness and reasonableness, it is no longer the sole consideration." Kennedy v. Kennedy, 7th Dist. No. 03 CO 37, 2004-Ohio6-798, quoting Olenik v. Olenik (Sept. 18, 1998), 7th Dist. No. 94 CA 139. The trial court is not required to comment on each factor, but need only indicate that the court considered each factor in making its spousal support award. Tallman v. Tallman, 6th Dist. No. F-03-008, 2004-Ohio-895, at ¶ 58; Stockman v. Stockman (Dec. 15, 2000), 6th Dist. No. L-00-1053.
 {¶ 35} R.C. 3105.18(C)(1) provides:
 {¶ 36} "(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 {¶ 37} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 38} "(b) The relative earning abilities of the parties;
 {¶ 39} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 40} "(d) The retirement benefits of the parties;
 {¶ 41} "(e) The duration of the marriage;
 {¶ 42} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 43} "(g) The standard of living of the parties established during the marriage;
 {¶ 44} "(h) The relative extent of education of the parties;
 {¶ 45} "(i) The relative assets and liabilities of the parties, including but not limited to any court ordered payments by the parties;
 {¶ 46} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 47} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 48} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 49} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 50} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 51} R.C. 3113.215(A)(2) defines gross income, in relevant part, as follows:
 {¶ 52} "(2) `Gross income' means, except as excluded in this division, the total of all earned and unearned income from all sources during the calendar year, whether or not the income is taxable, and includes, but is not limited to, income from salaries, wages, overtime pay and bonuses to the extent described in division (B)(5)(d) of this section * * *.
 {¶ 53} "`Gross income' does not include any of the following:
 {¶ 54} "* * *
 {¶ 55} "(e) Nonrecurring or unsustainable income or cash flow items."
 {¶ 56} R.C. 3113.215(A)(11) defines nonrecurring or unsustainable income as follows:
 {¶ 57} "(11) `Nonrecurring or unsustainable income or cash flow item' means any income or cash flow item that the parent receives in any year or for any number of years not to exceed three years and that the parent does not expect to continue to receive on a regular basis."
 {¶ 58} An award of spousal support, temporary or otherwise, should not be punitive or be based upon the conduct of a party. See Kennedy, supra;Bernard v. Bernard (Jan. 30, 2002), 7th Dist. No. 00 CO 25, 2002-Ohio-552. A trial court may modify a spousal support order when there has been a substantial change of circumstances. See Joseph v. Joseph (1997),122 Ohio App.3d 734, 736. A substantial change in circumstances includes any involuntary decrease in the party's wages or salary not contemplated at the time of the order. R.C. 3105.18. The party seeking a modification must demonstrate a substantial change in circumstances under R.C. 3105.18. Joseph, supra, 122 Ohio App.3d 734. If the party meets that burden, then the court must determine whether the existing obligation should be modified under R.C. 3105.18(C). Id. Whether a party "deserves" spousal support based on marital conduct is not a basis for awarding or denying support. Bowen v. Bowen (1999), 132 Ohio App.3d 616,626. The only relevant question is what is appropriate and reasonable under the circumstances of each case. Id.
 {¶ 59} We will first address the propriety of the initial $10,000 per month temporary spousal support award. In this case, at the time the temporary support was ordered, it was uncertain whether John would be receiving the annual income bonus with which he normally paid family debts from the previous year. The bonus money would have added another $11,000 plus to John's monthly gross income. Therefore, since the initial award was based upon the previous known annual income of the parties, we cannot say that it was improper.
 {¶ 60} At the January 2002 contempt hearing, however, undisputed evidence was presented from John's company that, due to national economic factors and a downturn in Kroy's business, he would receive no bonus for the 2001 tax year. Thus, the bonus, which had previously been an expected source of income, became nonrecurring, unsustainable income. This involuntary decrease of approximately one-third of John's income represented a substantial change in circumstances. Had the parties remained together, they would have had to adjust their lifestyle and spending habits to accommodate this decrease. In addition, no evidence was presented that John was hiding income or assets. Therefore, the evidence presented established that John's monthly income alone could not accommodate a $10,000 per month spousal support payment, in addition to payment of the marital obligations and his own living expenses. Further, because temporary spousal support prior to the final decree is simply an allocation of the marital income, no tax consequences needed to be considered at that point.
 {¶ 61} Temporary spousal support ordinarily represents one of the classic problems for the trial court in a divorce proceeding: how to support two (or as in this case three) households when a couple separates and lives apart during the pendency of the divorce. Although the trial court must consider the standard of living enjoyed by the parties, unless there is an unlimited source of funds, the separation of the parties usually necessitates a lessened standard of living. In our view, absent a specific finding that one party dissipated funds to the other's detriment, the trial court should ensure that each party has the ability to meet reasonable, necessary living expenses. Consequently, in accordance with the one-third decrease in income, the spousal support order should have been retroactively reduced to $6,666 per month, beginning with the October 3, 2001 filing of Kathleen's motion for contempt.
 {¶ 62} We now turn to the issue of whether John's use of marital funds to pay marital debts or spousal support was proper. Any reduction in the amount of a mortgage during the marriage by payment of marital funds contributes to the equity in the property and becomes marital property.Ray v. Ray, 9th Dist. No. 03CA0026-M, 2003-Ohio-6323, at ¶ 8; Charlesv. Charles (Jan. 22, 1997), 9th Dist. No. 96CA006396. Likewise, absent any finding of dissipation or wrongful conversion, marital funds may be used to pay spousal support. See Freytag v. Freytag (Aug. 15, 1994), 12th Dist. No. CA93-11-223. Thus, marital funds which were used to pay marital obligations may be excluded when computing the amounts of marital assets. See Micham v. Micham (Sept. 30, 1998), 6th Dist. No. L-97-1308;Josselson v. Josselson (1988), 52 Ohio App.3d 60, 62.
 {¶ 63} In this case, since the parties purchased their own separate houses prior to the final hearing with cash from marital funds, the only marital mortgage obligations were the two mortgages on the marital residence. This residence was ultimately sold during the pendency of the divorce, and the net proceeds presumably distributed as ordered by the final decree. However, during the divorce action, the parties still needed to maintain their individual living expenses, including utilities, food, transportation, clothing, and entertainment. Since John was the only source of income during the marriage, and Kathleen was essentially unemployable due to her physical and mental conditions, John's income or the parties' marital funds were the only sources of money for the payment of marital obligations.
 {¶ 64} John readily acknowledged and took responsibility for marital funds he spent for non-marital expenses. The record contains no evidence and the trial court made no finding of conversion or dissipation of marital funds by John. Although John was credited for $19,000 paid for some of the marital obligations paid from the Suntrust account, he was not credited for spousal support, some of the mortgage payments, or for the landscaping bill.[1] Any mortgage payments made from marital funds would have been converted to equity in the home when it was sold. Since any payments made for preservation of marital assets or payment of marital debts would have benefited both parties, the mortgage payments, the Nilsson landscaping bill for the marital residence, and payments on marital debts should have been permitted from the marital trust account.
 {¶ 65} Regarding the spousal support payments, after subtracting the $6,666, per our previous determination, from John's net income for each month, he would have had approximately the same amount for his own living expenses. After reviewing the initial order issued by the court, we agree that payment of spousal support was a legitimate use of the trust account, especially in light of John's payment of other marital obligations, since both parties were benefited.
 {¶ 66} In our view, after modifying the spousal support, both parties needed to adjust their spending habits. The court granted the early distribution of $100,000 to each party to cover any income shortfalls pending the final distribution of marital assets. Although John's decision to take his fund in stocks may have been an effort to avoid tax consequences, it prevented him from having a liquid account from which to draw funds needed for his day-to-day expenses. After deducting the expenses permitted from the marital trust fund, and recalculating the arrearage amounts using the reduced spousal support award, John's net monthly income should have sufficed to cover his expenses. Any additional expenses for either party should have been covered by their discretionary funds. Based upon our review of the record, each party should have had sufficient funds to live reasonably well, pending the divorce as well as after the marriage.
 {¶ 67} We also note that Kathleen was required to reimburse John for interest, taxes, and insurance payments made on the marital residence after she moved out in April 2002. As a result of our determinations, the amount imputed to the marital trust fund must be adjusted to reflect payments made toward marital obligations, credit for Kathleen's payments toward the mortgage, and the reduced amount of spousal support. Since the exact amounts of some of these payments are not in the record, we must remand to the trial court for determination of the amounts to be credited to the fund and to each party. In any event, however, spousal support should not be imputed back into the trust account, since the order permitted such payments. This recalculation will also then require an adjustment to the amount of Kathleen's lump sum distribution.
 {¶ 68} Accordingly, John's second assignment of error is well-taken.
 III. {¶ 69} In his third assignment of error, John argues that the trial court erred in awarding Kathleen $7,500 per month in spousal support and in requiring him to pay the annual premiums for a term life insurance policy without consideration of the increased cost in premiums at the end of the term.
 {¶ 70} Pursuant to R.C. 3105.18, a reasonable amount of spousal support should be awarded when appropriate. In making such a determination, a court should consider all of the factors listed in R.C.3105.18(C). Where the marriage was of long duration and one party lacks the potential to be self-supporting, it is appropriate that spousal support be awarded for an indefinite period. Nehls v. Nehls, 6th Dist. No. L-01-1382, 2002-Ohio3-820, ¶ 24, citing Kunkle v. Kunkle (1990),51 Ohio St.3d 64, paragraph one of the syllabus. Although a court should consider the income of the parties from all sources, including property division awards, a party is not required to sell assets awarded in order to increase that party's standard of living. Claytor v. Claytor (Feb. 8, 1996), 10th Dist. No. 95APF05-671.
 {¶ 71} In this case, John argues that the trial court's spousal support award of $7,500 per month to Kathleen was unfair. In order to determine whether the court's award was appropriate, we must compare thegross incomes of each party and consider the tax effects on each. Due to her physical and mental health issues, Kathleen's only sources of income until retirement age are spousal support and investment income. For the sake of argument, we will presume, as John suggests, that Kathleen's investment income will provide $1,250 per month. In addition, John's $3,750 annual payment of the life insurance premium, also considered spousal support, would add another $312 per month, for a total gross income of $9,062 per month.
 {¶ 72} Excluding any bonuses, John's base gross income, listed as $18,639 on the amended schedule filed by him, would be reduced by the spousal support ($7,500 and $312) to $10, 827, lowering his gross income substantially for tax purposes. Added to this amount, however, would be his vehicle allowance, any bonus payments, investment income, or other benefits. Therefore, considering the tax consequences and that, after payment of the spousal support, John still has a higher gross income that Kathleen, we cannot say that the trial court abused its discretion in its order to pay $7,500 per month of support.
 {¶ 73} As for the payment of the life insurance premiums, we cannot say that the trial court abused its discretion. A trial court may secure a spousal-support order with life insurance, but only if the court makes it clear that it is, in effect, ordering spousal support to extend beyond the death of the obligor. See R.C. 3105.18(B) (spousal support ends at death of either party, unless court orders otherwise); Waller v. Waller,
7th Dist. No. 04 JE 27, 2005-Ohio-4891; Woodrome v. Woodrome (Mar. 26, 2001), 12th Dist. No. CA00-050-74; Vlah v. Vlah (Nov. 28, 1997), 11th Dist. No. 97-G-2049; Pope v. Pope (Apr. 11, 1997), 6th Dist. No. L-96-198; Moore v. Moore (1997), 120 Ohio App.3d 488 (9th District);Addy v. Addy (1994), 97 Ohio App.3d 204 (10th District); McCoy v.McCoy (1993), 91 Ohio App.3d 570 (8th District).
 {¶ 74} In this case, the judgment entry and decree of divorce in this case specifically provides that the obligation to pay spousal support "shall terminate upon the earlier of [Kathleen's] death, her remarriage, or her co-habitation with a non-relative male." Since the court omitted John's death as a terminating factor, the court clearly expressed its intent for spousal support to continue after his death. Furthermore, the evidence presented regarding any future increase in cost of the insurance premiums was vague, at best. The court reserved jurisdiction to review spousal support, however, and this issue may be revisited by the court should increased premiums become an issue. Since the life insurance policy's purpose is to secure Kathleen's spousal support after John's death, the trial court may examine all then relevant factors or significant changes, such as the parties' incomes, their needs and ages, and the possible reduction of the policy amount to provide the necessary protection at a reduced cost. As we noted previously, the payment of these premiums reduce John's gross income and increase Kathleen's, affecting both parties' taxable income. Therefore, we cannot say that the trial court's order for John's annual payment of the life insurance premium was an abuse of discretion.
 {¶ 75} Accordingly, John's third assignment of error is not well-taken.
 IV. {¶ 76} We will now address John's final assignment of error and Kathleen's cross-assignment of error regarding the payment of attorney fees. In this fourth assignment of error, John argues that the trial court erred in its award to Kathleen of $32,500 for attorney fees. He states that the trial court's award was based upon issues relating to a contempt action which took place after the final hearing date. He also states that the initial $100,000 distributions to each of the parties were discretionary funds, providing a source for payment of attorney fees. Kathleen, on the other hand, complains that she should have received the entire amount requested, $65,000.
 {¶ 77} The decision of whether to award attorney fees rests in the sound discretion of the court and will not be overturned on appeal absent an abuse of that discretion. Layne v. Layne (1992), 83 Ohio App.3d 559,568; Birath v. Birath (1988), 53 Ohio App.3d 31, 39, citing to Gagev. Gage (1956), 165 Ohio St. 462. An abuse of discretion is more than an error of judgment or a mistake of law, the term connotes that the court's attitude is arbitrary, unreasonable or unconscionable. Blakemore, supra, at 219.
 {¶ 78} Prior to April 2005, attorney fees were awarded in domestic relations cases pursuant to R.C. 3105.18, which included the award of attorney fees as spousal support. In determining whether to award reasonable attorney fees to either party, the trial court was required to decide "whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees." R.C. 3105.18(H). Fees could be awarded only if the payor spouse had the ability to pay. Id. See, also,Leff v. Leff (Mar. 2, 2000) Cuyahoga App. Nos. 75551, 75581; Lee v. Lee
(1983), 10 Ohio App.3d 113.
 {¶ 79} In April 2005, however, R.C. 3105.73 went into effect, substantively changing the applicable standard for attorney fee awards in divorce proceedings. The current statutory section now provides that a court "may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." According to the Uncodified Law, this section is intended to apply to "any action for divorce, legal separation, or annulment of marriage or any post-decree action or proceeding arising from a divorce, legal separation, annulment, or dissolution of marriage if any of the following apply:
 {¶ 80} "* * *
 {¶ 81} "(B) The action or proceeding is brought, or a notice of appeal in the action or proceeding is filed, prior to the effective date of this act, and the action or proceeding is pending in a trial or appellate court on the effective date of this act."
 {¶ 82} In other words, a literal reading of the statute would require us to retroactively apply a completely different substantive standard to the trial court's decision in this case. Since that retroactive application would affect substantive rights and, thus, would be unconstitutional, we decline to apply the new standard to the trial court's decision to award attorney fees. See Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 107 (a statute is "substantive" if it impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligation, or liabilities as to a past transaction, or creates a new right.) Although the new standard would apply to any request for fees rendered in an appellate case granted after the effective date, we agree with the parties that the previous standard delineated under former R.C. 3105.18(H) should apply to our review of the trial court's award of attorney fees.
 {¶ 83} Attorney fees are awarded as spousal support, and in awarding such fees, the court must consider the factors of R.C. 3105.18(C). SeeWilliams v. Williams (1996), 116 Ohio App.3d 320, 323. In addition, R.C. 3105.18(C)(1)(n) provides that the court may consider "any other factor that the court expressly finds to be relevant and equitable." A trial court has broad discretion in awarding attorneys fees in divorce actions. Swanson v. Swanson (1976), 48 Ohio App.2d 85, 90, Birath,
supra. A court's decision regarding the award of attorney fees as part of an award of spousal support will not be disturbed on appeal absent a showing of a clear abuse of that discretion. See Rash v. Rash, 6th Dist. No. F-04-016, 2004-Ohio-6466, at ¶ 53; Guziak v. Guziak (1992),80 Ohio App.3d 805, 816. As we noted previously, an abuse of discretion is more than a mere error of law; rather, it implies that the court's decision was unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1993), 5 Ohio St.3d 217, 219.
 {¶ 84} In this case, the attorney fees awarded were one-half of the amount allegedly incurred by Kathleen as a result of the litigation of the divorce. The court specifically found them to be reasonable, and then split the cost between the parties. Although Kathleen is physically and mentally unable to earn income, she did receive some income producing property from the marriage. Nevertheless, she should not have to deplete her marital property award in order to pay her attorney fees. Therefore, the record provides evidence in support of an award of attorney fees to protect and fully litigate Kathleen's interests. In addition, at the time of the divorce, John had the ability to pay since he was highly employable and, thus, capable of replenishing income without having to resort to the sale of the marital property awarded to him. Contrary to John's claims, we can find nothing in the trial court's decision which indicates the fees were awarded as a result of a subsequent contempt actions. Consequently, we cannot say that the trial court abused its discretion in requiring John to pay one-half of the fees in order for Kathleen to fully litigate her rights without utilizing her marital assets.
 {¶ 85} Accordingly, John's fourth assignment of error and Kathleen's cross-assignment of error are both not well-taken. This case is remanded for the purpose of calculation and crediting of amounts paid by appellant for marital obligations, including spousal support, recalculating arrearage based upon the reduced temporary spousal support, and the adjustment of the amount of the lump sum distribution.
 {¶ 86} Appellant and appellee are each ordered to pay one-half of the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Singer, P.J. and Skow, J. Concur.
[1] The evidence presented during the contempt hearing and later at the final divorce hearing indicated that the following bills were paid either for marital debts, to preserve marital assets, or were a direct benefit to Kathleen: mortgage payments, Kathleen's doctor bills, the $15,000 Nilsson landscaping bill, the $3,700 life insurance premium, credit card payments, the $900 pet sitting service fees, and the $7,000 refrigerator (which became a marital asset presumably included in the value of the Perrysburg home contents.)